[Crim. No. 40265. Second Dist., Div. Four. Aug. 17, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY MORENO FRAUSTO et al., Defendants and Appellants.

COUNSEL

Robert D. Coppola, Jr., and Thomas Kallay, under appointments by the Court of Appeal, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TEVRIZIAN, J.\***—

### STATEMENT OF THE CASE

In an information filed by the District Attorney's Office of Los Angeles County, appellants were originally charged in the superior court with the crimes of assault with intent to commit murder. (Pen. Code, § 217.) Said charge was later amended on motion of the People to assault with a deadly weapon (Pen. Code, § 245, subd. (a)) subsequent to the repeal of Penal Code section 217. In addition, the amended information contained allegations that appellant Frausto with the intent inflicted great bodily injury (Pen. Code, §§ 12022.7 and 1203.075) and used a firearm (Pen. Code, §§ 12022.5 and 1203.06, subdivision (a)(1)) at the time of the commission of the offense. An allegation that appellant Frausto was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a) was struck. Appellants pleaded not guilty to the amended information. The appellants' motions under Penal Code sections 995 and 1538.5 were denied.

Appellants were found guilty as charged in the information by a jury. The allegations concerning great bodily injury and the use of a firearm were found true as to appellant Frausto. Appellant Frausto also admitted the conviction of a prior felony.

Appellant Bazurto was sentenced to the state prison for the upper term of four years. Appellant Frausto was sentenced to the state prison for the upper term of four years, plus four additional years on the enhancements.

---

*Assigned by the Chairperson of the Judicial Council.

This appeal by both appellants is from the judgments of conviction. Both appellants filed timely notices of appeal.

STATEMENT OF FACTS

A. *The Trial*

1. *The Prosecution's Case*

On March 27, 1980, Debra Elliott was employed at the U-Tote-Em Market at 13746 Meyer Road in the City of Whittier, County of Los Angeles, as the assistant manager. Ms. Elliott's hours of employment on that particular shift on that date were from 2:30 p.m. to 10:45 p.m. Nelson Martinez, aka Jeffrey Adams, an old friend, had a date with Ms. Elliott on the date in question. Mr. Martinez arrived early at the U-Tote-Em Market at approximately 10 p.m. in order to help Ms. Elliott clean up the store and get things organized so that she could leave her employment shift early.

After Ms. Elliott's replacement clerk had arrived both Ms. Elliott and Mr. Martinez left the U-Tote-Em Market at approximately 10:50 p.m. to purchase some liquor at a liquor store. Within minutes Ms. Elliott and Mr. Martinez returned to the U-Tote-Em Market to enable Ms. Elliott to use the restroom facilities at her store.

Mr. Martinez parked his vehicle (Aspen) in the parking space in front of the trash can in the front of the store. Both Ms. Elliott and Mr. Martinez went into the store. Ms. Elliott used the restroom facilities in the store, came out and talked to the replacement clerk for a few minutes. Ms. Elliott then got back into Mr. Martinez's vehicle. At this point in time, Ms. Elliott accidentally dumped the contents of her purse in the backseat of Mr. Martinez's vehicle.

Shortly before, a tan late model Chevrolet had pulled into the parking lot in the area in front of a public telephone, parking parallel to and in the same direction as Mr. Martinez's vehicle. Four individuals got out of the tan vehicle and approached the public telephone. These four people appeared to be of "Mexican-American" descent, between the ages of 18 and 24. One of these four individuals was making a telephone call. One man, the victim, Guadalupe Mares, remained inside of the tan vehicle in the driver's seat.

Mr. Martinez stood in the parking lot, leaned into the backseat of his vehicle and was picking up the contents of Ms. Elliott's purse when Ms. Elliott, looking over her shoulder, saw appellant Anthony Bazurto's 1964 Chevrolet Impala followed by a black Chevelle enter the parking lot. The Chevrolet Impala was going "really slow," according to the testimony of Ms. Elliott. The Chevelle went around the Chevrolet Impala and went toward the gas pumps at the U-Tote-Em Market. The parking lot was well lit.

As soon as the Chevrolet Impala pulled up to the area of both Mr. Martinez's vehicle and the tan vehicle in which the victim, Mr. Mares, was seated, Ms. Elliott started to turn her head to see what Mr. Martinez was doing with the contents of her purse. Ms. Elliott heard a loud noise like a "firecracker or a shot." Ms. Elliott immediately turned her head back to the right and saw everybody hitting the floor. Mr. Martinez, who had also heard the shot, pushed his way into his vehicle with the upper portion of his body ending up on Ms. Elliott's lap.

Ms. Elliott saw a gun lodged on the windowsill of the Chevrolet Impala. The person who had possession of the gun was sitting in the right front passenger's seat of the Chevrolet Impala. The weapon was a .38 handgun.

The gunman was staring at the tan vehicle and the gun was still lodged in the gunman's hand as the Chevrolet Impala was driving slowly forward toward the back of the vehicle in which Ms. Elliott was seated. Ms. Elliott testified she heard a total of three shots fired. The gun was still being held by the same gunman. The Chevrolet Impala then drove away.

Ms. Elliott got the license number of the Chevrolet Impala—the license number being OOE 298. She wrote the license number down on a piece of paper or a receipt or slip and gave it to a deputy sheriff.

After the Chevrolet Impala had left the parking lot, both Ms. Elliott and Mr. Martinez ran over to the victim's vehicle and saw the victim slumped over in the front seat with blood pouring out of the left side of his chin. With some assistance, Ms. Elliott got the victim, Mares, out of the victim's automobile and managed to stop the bleeding. Testimony by the doctor on duty, Dr. Rodney Schmidt, in the hospital emergency room where the victim, Mr. Mares, was taken, established that Mr. Mares had sustained a solitary gunshot wound to his left chin.

Appellant Anthony Bazurto was the owner and operator of a 1964 Chevrolet Impala, license plate number OOE 298 on March 27, 1980, at the time of the shooting of Guadalupe Mares in the U-Tote-EM parking lot at 13746 Meyer Road in the City of Whittier, County of Los Angeles.

Shortly after the shooting, deputies from the Los Angeles County's Sheriff's Department arrived. Deputy Davis obtained a description of the shooter and of the driver of the Chevrolet Impala from Ms. Elliott and left to look for them. Deputy Davis spotted the Chevrolet Impala at approximately 11:30 p.m. on March 27, 1980. Appellants Gary Moreno Frausto and Anthony Bazurto were arrested without resistance.

Immediately after the arrest, Deputy Duron searched the Chevrolet Impala at the scene of the arrest. Deputy Duron found a handgun case on the front seat without a weapon in it, in fact, he found neither a gun nor any bullets anywhere in the vehicle.

Ms. Elliott and Mr. Martinez were taken by the police to the location where appellants Gary Moreno Frausto and Anthony Bazurto were arrested. Ms. Elliott identified appellant Gary Moreno Frausto as the shooter, and appellant Anthony Bazurto as the driver of the Chevrolet Impala. Mr. Martinez identified appellant Gary Moreno Frausto as the man who had done the shooting.

Over defense objection, the victim, Mr. Mares, was allowed to testify that he knew the U-Tote-Em Market was on the "turf" of the South Side Whittier gang. Mr. Mares claimed a particular neighborhood as his barrio or turf which was known as "El Nohyo Mara." It was located in East Los Angeles.

The occupants of the victim's vehicle when it arrived at the said market were, in addition to Mr. Mares, two females named Debra Padua and Arleen Ann Soto, and two males by the names of Raul Arias and Ricky or Randy Rodriguez. Debra had been picked up in Whittier and the other occupants of Mr. Mares' vehicle had come from East Los Angeles to Whittier in the victim's automobile. The reason for the stop at the U-Tote-Em Market on March 27, 1980, was to allow Debra to use the public telephone to try to get a date for Mr. Mares.

The victim, Mr. Mares, was unable to say who shot him. Mr. Mares remembered driving his automobile into the parking lot of the U-Tote-

Em Market. The other occupants of his vehicle had gone to the public telephone. The said market was not located inside the territory that was claimed by El Nohyo Mara. Mr. Mares testified that he knew of his own knowledge that, when he drove into the parking lot, it was perhaps claimed as the turf or territory of another gang—the gang being South Side Whittier.

The victim did not have a gun in his possession when he drove into the said parking lot, nor to his knowledge did any of the other people in his vehicle have a weapon or gun in their possession.

### 2. *The Defense*

The defense presented evidence that the victim, Guadalupe Mares, was shot by a short, stocky, and medium complexioned man wearing a dark jacket and a beanie. Testifying in support of this were the two females that had accompanied the victim to the U-Tote-Em Market— Debra Padua and Arleen Ann Soto—as well as the appellant Anthony Bazurto.

Appellants' activities prior to the shooting are not in issue. Appellant Anthony Bazurto did, however, admit being in the parking lot of the U-Tote-Em Market on March 27, 1980, at the time the shooting took place. Appellant Anthony Bazurto testified that once in the parking lot he and appellant Gary Moreno Frausto stopped the automobile they were riding in because they saw some girls. Appellant Anthony Bazurto wanted to talk to the girls to see if they wanted to go to a party.

Appellant Anthony Bazurto testified that he was not at the time of trial, nor on March 27, 1980, associated with "South Side Whittier."

### APPELLANTS' CONTENTIONS ON APPEAL

A. Appellant Frausto contends that:

1. The conduct of the trial was unfair.

2. His trial counsel was incompetent.

B. Appellant Bazurto contends that:

1. The trial court abused its discretion in permitting repeated references to gangs and gang-related activity.

2. There was reversible error to admit into evidence repeated references to gangs and gang-related conduct.

3. The trial court should have instructed the jury, *sua sponte*, that evidence of gang membership was admissible to prove motive only.

4. There was ineffective assistance of counsel.

5. The prosecutor was guilty of misconduct.

6. There was abuse of discretion by the trial court in shackling appellants during the trial.

7. The trial court erred in imposing the upper term.

## DISPOSITION

We find appellants' contentions to be unmeritorious for the reasons set forth below and therefore affirm the judgment of the trial court.

## DISCUSSION

### I

### APPELLANTS' TRIAL COUNSEL WERE NOT INCOMPETENT

Both appellant Bazurto and appellant Frausto urge that their trial counsel were incompetent. In this regard, they both focus the bulk of their arguments on the lack of any real objection to testimony introduced relative to gangs and gang-related conduct.

To establish a claim of incompetence of counsel, it must be shown "that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R. 4th 1].) Tactical decisions under the *Pope* standard are normally left in the wide discretion of defense counsel and will not be normally overturned on appeal. (See *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Lanphear* (1980) 26 Cal.3d 814, 828 [163 Cal.Rptr. 601, 608 P.2d 689]; *People* v. *Frierson* (1979)

25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587]; *People v. Pope, supra*, 23 Cal.3d at p. 424; *People v. Najera* (1972) 8 Cal.3d 504, 516 [105 Cal.Rptr. 345, 503 P.2d 1353]; *People v. Murphy* (1972) 8 Cal.3d 349, 367 [105 Cal.Rptr. 138, 503 P.2d 594]; *People v. Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1].) In addition, appellant must affirmatively show that the omission of defense counsel involved a crucial issue and that the omission cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Jackson, supra*, 28 Cal.3d at p. 289; *People v. Pope, supra*, 23 Cal.3d at p. 425; *People v. Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64].)

Furthermore, the indiscriminate use of objections solely because they are available does not aid either the client nor the cause of justice. (See *People v. Jackson, supra*, 28 Cal.3d at p. 292, citing *People v. Thomas* (1974) 43 Cal.App.3d 862, 869 [118 Cal.Rptr. 226].)

The issue then is whether such objections by defense counsel would have been appropriate in this case. ■ Merely tactical errors by counsel are not deemed reversible (*People v. Pope, supra*, 23 Cal.3d at p. 425; *People v. Strawder* (1973) 34 Cal.App.3d 370, 382 [108 Cal. Rptr. 901]), for the decisions of counsel in the midst of trial cannot be second-guessed by the hindsight of an appellate court (*People v. Whittington* (1977) 74 Cal.App.3d 806, 819 [141 Cal.Rptr. 742]). ■ We are not persuaded by appellants' arguments and conclude that they have not made the showing required to establish a claim of ineffective assistance of trial counsel.

Moreover, the record satisfies us that an adequate defense was presented at trial in the face of overwhelming evidence against the appellants.

It should first of all be noted that the evidence of gangs and gang-related activity was sparse indeed. If anything, the evidence relative to gangs shows that the victim and his companions were gang members. There was evidence that the victim, Guadalupe Mares, belonged to the "El Nohyo Mara" gang. There was further evidence that his companion, Raul Arias, was a member of the same gang. There was also evidence presented through the victim that being a member of a gang he knew that the U-Tote-Em Market parking lot was claimed as the "turf" or territory of another gang, the South Side Whittier.

When appellant Bazurto took the stand in his own behalf, he admitted that he was from South Side Whittier but not for five or six years in the past. He also admitted that he had willingly tattooed on his chest, "SSW," which stood for South Side Whittier.

Appellant Bazurto urges that the trial court abused its discretion in permitting repeated references to gangs and gang-related activity, and furthermore erred in admitting into evidence references to gangs and gang-related conduct. However, since there was no objection on this point, the issue of the trial court's discretion in this matter is totally moot and the issue, at least relative to the trial court's discretion, is without merit. (See *People* v. *Saddler* (1979) 24 Cal.3d 671, 684 [156 Cal.Rptr. 871, 597 P.2d 130]; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217, 501 P.2d 225].)[1]

It can be seen, therefore, that the evidence presented by the prosecution and on cross-examination of defense witnesses, was quite modest. First of all, there was properly no objection by defense counsel, because the testimony was admissible as to the issue of motive. ██ It is proper to introduce evidence of membership in a gang or any type of group which relates to a question in issue such as motive. (See *People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 499 [175 Cal.Rptr. 445]; *People* v. *Perez* (1981) 114 Cal.App.3d 470, 478-479 [170 Cal.Rptr. 619].) Thus, it has repeatedly been held that it is proper to introduce evidence which is even unpleasant or negative pertaining to an organization in issue which is relevant on the issue of motive or the subject matter at trial. In *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 841-844 [153 Cal.Rptr. 89, 2 A.L.R.3d 1135], it was proper to introduce evidence of various criminal acts of a terriorist group, the Symbionese Liberation Army, in order to show the nature of the conspiracy pertaining to a murder.

---

[1]The only true objections made by both trial counsel was an objection by appellant Bazurto's attorney relative to the form of a question concerning appellant Bazurto's association with South Side Whittier on March 27, 1980, and not on the issue of his membership. In the motion for new trial, there was a brief discussion by appellant Frausto's attorney that there were prejudicial statements relative to allegations concerning gang membership and appellant Bazurto's counsel joined in those statements. In addition, on direct examination of the victim, Guadalupe Mares, appellant Bazurto's attorney objected on the basis of relevancy to a question asked by the prosecuting attorney regarding the victim's knowledge that the parking lot was the territory of another gang. The objection was overruled. For all practical purposes, there was no true objection to evidence relative to gang membership.

In the same manner, in *People* v. *Manson* (1976) 61 Cal.App.3d 102, 131, 155-156 [132 Cal.Rptr. 265], it was proper to introduce evidence of the social structure, religion, and criminal activities of an organization known as the "Family" because of its relevancy to the motivation and the nature of the conspiracy of the Tate-LaBianca murders. In *In re Darrell T.* (1979) 90 Cal.App.3d 325, 328-334 [153 Cal.Rptr. 261], the court discussed evidence concerning the history and nature of various juvenile gangs as it pertained to the proof of the existence of a motive relative to the crime of murder. In *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 194 [113 Cal.Rptr. 254], evidence concerning a membership in the Hell's Angels was deemed to be properly introduced relative to the issue of motive. In *People* v. *McDaniels* (1980) 107 Cal. App.3d 898, 904-905 [166 Cal.Rptr. 12], a companion case to *In re Darrell T.*, the Court of Appeal upheld the use of gang experts "relating to the sociology and psychology of gangs."

In the case within, gang membership was quite relevant. The victim and some of his companions were admitted members of a gang that were inside of the territory or turf of another gang. Additionally, appellant Bazurto admitted, in the past, having been a member of the gang who claimed the scene of the crime as their territory.

There would be a tactical reason not to object to the admission of such evidence. The bulk of the evidence presented relative to the gangs concerned the victim and his friends, not appellant Bazurto. Thus, the jury was made aware of the fact that the victim was a member of a gang as were some of his companions and that they had ventured into the territory of another gang. In fact, counsel for appellant Bazurto, in his argument in discussing the victim, stated: "He is a gang member."

Therefore, the evidence presented showed the victim and his companions in an unfavorable light because of the definite admission of the victim that he was a gang member in another gang's territory. As such, evidence of gangs was a twin sword which could be utilized by the defense in attacking the credibility of the victim.

The fact that gangs were involved would not be inconsistent with the defense, namely, that the victim went into the territory of another gang and was shot by third parties in that territory. Certainly, appellants

could not have been prejudiced by reason of the evidence of gangs as the evidence against them was overwhelming. Ms. Elliott identified both appellants and Mr. Martinez identified appellant Frausto as looking very similar to one of the people there. The automobile was identified with the same license number in the area shortly after the shooting and a gun case was found inside of the vehicle. Gang membership in no way harmed appellants, because it showed the victim as being a gang member and in fact assisted in the alibi of appellant Bazurto that a third party killed the victim in the parking lot.[2]

■ Appellant Bazurto further urges a rather novel approach. Out of one side of his mouth appellant Bazurto argues that the trial court should have instructed the jury *sua sponte* that evidence of prior gang membership by appellant Bazurto was admissible for the limited purpose to prove motive only, and suggests that CALJIC No. 2.50 could have been tailored by the trial court to achieve the desired result.[3] Out of the other side of his mouth appellant Bazurto argues that no such request for a modified CALJIC No. 2.50 was made in this case. Regrettably, appellant continues, he must contend on appeal that this was an omission which deprived this appellant of an effective defense.

It should be pointed out that the trial court did give CALJIC instructions Nos. 2.09 and 2.51. The giving of these instructions by the trial court covered all principles of law raised by the evidence. The general principles of law governing the case are those principles closely and openly connected with the facts before the court and which are necessary for the jury's understanding of the case.

An instruction such as appellant Bazurto desired which would have highlighted the fact that appellant Bazurto belonged to the South Side Whittier gang in the past was properly not requested by trial counsel or

[2]We see nothing in the recent case of *People* v. *Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569], decided on July 8, 1982, to vary our opinion.

[3]With the proposed change, CALJIC No. 2.50 would have read as follows:
"Evidence has been introduced for the purpose of showing that the defendant Bazurto had belonged to the South Side Whittier gang five or six years prior to March 1980.
"Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has·a disposition to commit crimes.
"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: A motive for the commission of the crimes charged."

given *sua sponte* as it would have highlighted appellant Bazurto's membership, albeit in the past, in a gang.

Without the requested instruction, what stood out in the testimony was the fact that the victim was a gang member. As such, there were sound tactical reasons for not requesting or drafting a specific instruction or variation of CALJIC No. 2.50 as appellant Bazurto now requests on appeal. Appellant Bazurto's suggestion that such an instruction should have been given, *sua sponte*, should be rejected since the trial court need not give *sua sponte* instructions for specific points raised at trial but only as to general principles. (See *People v. Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534]; *People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]; *People v. Powell* (1974) 40 Cal.App.3d 107, 165 [115 Cal.Rptr. 109]; *People v. Brunt* (1972) 24 Cal.App.3d 945, 956 [101 Cal.Rptr. 457]; *People v. Williams* (1971) 17 Cal.App.3d 554, 566 [94 Cal.Rptr. 234], overruled on another point in *People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].)

■ Appellant Frausto urges that his trial counsel was ineffective by not objecting to testimony relative to ballistics and photographs of two firearms used for demonstration purposes. The record reflects that Louis Berry, a deputy sheriff for the County of Los Angeles, was a firearms examiner with formal education in this area. He had prepared photographs to show to the jury two different handguns as examples of the difference between a revolver and semiautomatic pistols. The fact that Sergeant Berry was an expert by reason of his background would not be any grounds for objection. Secondly, the use of the photographs of the two guns, which the expert testified he had prepared to show as an example to the jury what these types of weapons looked like, was also quite proper.

Where the actual weapon is not found, it is quite proper to introduce a replica or similar weapon to the jury as an example of the type of weaponry that might have been used in a crime. (See *People v. Wiley* (1976) 18 Cal.3d 162, 176 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. De La Plane* (1979) 88 Cal.App.3d 223, 239 [151 Cal.Rptr. 843].) As such, this testimony was entirely proper and thus defense counsel was not incompetent for not objecting to it.

■ Furthermore, appellant Frausto urges that his counsel was ineffective for not attempting to have his own forensic pathologist called

as a witness. On August 5, 1978, an order was signed appointing Dr. Victor Rosen, M.D., Ph.D., as an expert witness pursuant to sections 730 and 952 of the Evidence Code. Dr. Rosen is a board certified forensic pathologist. However, there is nothing in the record to show that there would be any purpose served in having the expert called as a witness on appellant Frausto's behalf. Without such a showing, this issue is not appealable. (See *People* v. *Jackson, supra*, 28 Cal.3d at pp. 288-293.)

As such, we conclude that there has been no showing of incompetence of counsel as to either appellant Frausto's attorney or appellant Bazurto's attorney at trial.

## II

### THE PROSECUTOR WAS NOT GUILTY OF MISCONDUCT

█ Both appellants contend that the prosecutor was guilty of prosecutorial misconduct in his closing arguments to the jury.

Appellant Bazurto urges that the prosecutor was guilty of misconduct in stating to the jury as follows:

"[Prosecutor Mr. Gosney:] No one attempted to testify or was even questioned about whether Anthony Bazurto was a member of South Side Whittier until he took the stand, and I asked him are you a member of South Side Whittier? No. I gave that up when I was a young kid.

"When I asked him did somebody put that tattoo, SSW, on your chest against your will? No. Well, I don't know.

"The entire nature of the crime, I think you are entitled to look at that, the way it went down as a gang type thing by anyone's reasonable interpretation of it, but you know you are suppose to logically infer certain things.

"This suggestion that I attempted to make this a big gang thing, I think it is abundantly clear this involved a gang thing.

"It is true, and I am going to concede that no one ever did say that they heard [you say the] South Side Whittier. I am from South Side

Whittier. No one would testify to that, but when questions are asked like that, don't you think that if I didn't have a good basis and good faith basis in fact for asking that, that someone would have been up there screaming bloody murder to—

"[Deputy Counsel Mr. Fisher]: I am going to object to that.

"THE COURT: Sustained. Improper argument."

Aggressive, permissible advocacy on both sides should be encouraged not discouraged. Here, a reading of the record indicates that the prosecution was culpable of aggressive advocacy not amounting to prosecutorial misconduct. The error, if any, was harmless especially when the trial court sustained defense counsel's objection to the prosecutor's analysis of the evidence. For this reason, we must reject the contention of appellant Bazurto that the prosecutor was guilty of misconduct.

██ Appellant Frausto contends that the prosecutor improperly commented upon his refusal to testify in his own behalf. (See *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].)

The record reveals that, during defendant Frausto's closing argument to the jury, his defense counsel argued as follows:

"[MR. BUNNETT:] Also, you might recalled that Mr. Frausto did not testify in this case, and the reason he didn't testify is because the People have not proved their case beyond a reasonable doubt. They haven't even come close. There are too many holes in the case. Too many people saw different things.

"Now, the judge will give you an instruction, and I would like to just read it to you.

"It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that he does not testify.

"Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

"The judge will further instruct you in deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and

upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him, and no lack of testimony on the defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element.

"Again, the People have not proved their case beyond a reasonable doubt...."

During the rebuttal portion of closing argument, the prosecutor argued as follows:

"[Mr. Gosney:] One further thing, I won't touch this any closer than a ten foot pole. The defendant Frausto's attorney said his client did not testify—

"MR. BUNNETT: I am going to object to this line of argument.

"THE COURT: Counsel is entitled to comment on argument.

"MR. GOSNEY: He [referring to Mr. Bunnett] said that my client, referring to Frausto, did not testify because the prosecution did not prove his guilt beyond a reasonable doubt.

"You judge the evidence. I just submit to you that is his opinion. He is the spokesman for the defendant. That is all I am going to say about it."

Our Supreme Court stated in *People* v. *Jackson, supra*, 28 Cal.3d at page 304: "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand. The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (*People* v. *Vargas* (1973) 9 Cal.3d 470, 475 ....) .... [¶] The controlling fact is, as we made explicit in *Vargas*, that such indirect, brief and mild references to defendant's failure to testify, without any suggestion whatever that an inference of guilt should be drawn therefrom, are uniformly held to constitute harmless error...."

A complete reading of the record in this case leads us to conclude that the prosecutor merely commented on the state of the evidence and not on any inference of guilt to be drawn. The prosecutor's comments

were sterilized and do not amount to any error whatsoever. We accordingly conclude that, on the basis of the record before us, the prosecutor's remark was proper.

III

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN SHACKLING<br>THE APPELLANTS

 Appellant Bazurto contends that there was insufficient cause to have appellants shackled during the course of the trial. We disagree.

The relevant basic principles to which we must look have been articulated in *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]. First, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a *manifest need* for such restraints." (Italics added.) (*Id.*, at pp. 290-291; fn. omitted.) Second, if the question of physical restraints arises, it is the trial court's obligation to initiate procedures to resolve the question. Third, the procedures the trial court may initiate must be such as to enable it to "make a *due process* determination of record that restraints are necessary." (Italics added.) (*Id.*, at p. 293, fn. 12.) Fourth, in determining whether physical restraints are to be employed, the record must show the likelihood of escape from violence or a threat of violence or other nonconforming conduct *in the courtroom*. Fifth, the trial court has discretion, upon a proper showing, to impose such physical restraints as seem appropriate. In exercising its discretion, the trial court should sanction the use of shackles only as a last resort, less obtrusive and less visible restraints being ineffective to ensure safety in the view of the trial court. Sixth, if the trial court in exercising its discretion orders visible restraints, the court must "instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt." (*Id.*, at pp. 291-292.) Finally, in *Duran*, the Supreme Court has made it clear that a trial court's determination imposing physical restraints, arrived at in a procedure consonant with *Duran*, "cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*Id.*, at p. 293, fn. 12.)

 The record reveals that the trial court judge complied with the requirements as laid down in *People* v. *Duran, supra*, in ordering *non-*

*visible* restraints being placed on each of the appellants during the course of the trial.

## IV

### Appellants Were Properly Sentenced to the Upper Term

Appellant Bazurto contends that he was improperly sentenced to the upper term. We disagree.

California Rules of Court, rule 443, states: "Whenever the giving of reasons by the sentencing judge is required, the judge shall state in simple language the primary factor or factors that support the exercise of discretion or, when applicable, state that the judge has no discretion. The statement need not be in the language of these rules. It shall be delivered orally on the record."

A reading of the record indicates that the trial judge, more than adequately, articulated his reasons pursuant to California Rules of Court, rule 421, when selecting the upper term in sentencing appellants. Specifically, the trial judge relied upon California Rules of Court, rule 421(a)(3) and (8).

### Conclusion

We find appellants' contentions to be unmeritorious and therefore affirm the judgments of the trial court as to both appellants.

Kingsley, Acting P. J., and McClosky, J., concurred.

The petition of Appellant Bazurto for a hearing by the Supreme Court was denied October 13, 1982. Bird, C. J., was of the opinion that the petition should be granted.