[Crim. No. 32199. Second Dist., Div. Five. Feb. 23, 1979.]

In re DARRELL T., a Person Coming Under the Juvenile Court Law. THE PEOPLE, Plaintiff and Respondent, v. DARRELL T., Defendant and Appellant.

COUNSEL

Susan L. Wolk, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HASTINGS, J.—Darrell T., a minor, appeals from the juvenile court order of wardship (Welf. & Inst. Code, § 602) upon a finding that he murdered Bradley Kevin Phillips in violation of Penal Code section 187. He was committed to the California Youth Authority (CYA) and a previous order for camp community placement was terminated. He now appeals from the judgment (order of commitment), contending (1) that the court erred in denying his motion to obtain a copy of the transcript of the fitness hearing of James McDaniels, "a severed co-minor," and one of appellant's witnesses; (2) that there was insufficient evidence to sustain the petition as to the murder; (3) that he was denied his right to a fair trial when witness McDaniels was permitted to invoke his privilege against self-incrimination; and (4) that the court erred in denying his request to have the witnesses Mark Edwards, Nicardo P. and Michael P. (who had been granted immunity) examined by a psychiatrist.

On April 19, 1977, there was gang hostility and antagonism between various "Crip" factions and the "Fives." The Crips were not a gang per se but were factions that used the name "Crips" after another name. These factions included the "Payback Crips," the "Raymond Crips," the "107 Crips," the "9-Deuce Hoover Crips," and other groups. The "Fives," a non-Crips gang, was also called the "135."

According to Robert Wilkins, a security agent at Gardena High School, there had been anger and hostility since 1975 between the Payback Crips and the Fives. The day before the killing, April 18, 1977, there had been a fight between the Shotgun Crips and the Fives at Gardena High School in which 20 to 30 people were involved. The various Crip factions would

squabble among themselves,[1] but would not unite with a non-Crip gang such as the Fives to form an alliance. Thus, while each of the separate Crip factions was, in effect, autonomous, the various Crip units involved in the present case were by their very nature "anti-Fives."

On the morning of April 19, 1977, Daryl Wade, a member of the Fives, observed Reggie T. running around the track saying, "Payback Crip." Subsequently, Derrick J. and another individual circled Wade. According to Wade, Reggie T. tried to hit him and Derrick J. jumped in. Wade ran away.

Later that day at around noontime, Reggie T. beckoned Wade and there was another fight between the two. Security Agent Wilkins noted that before the fight commenced, Reggie T. was in the company of Derrick J. and co-minor Milton D. The fight was broken up before the two factions present had the opportunity to interact.

As Daryl Wade was taken to the school office, Derrick J. told him, "Your neighborhood is dead." In Wade's opinion, this meant that "they were coming over there and get us and shoot at us, whatever."

Reggie T. was taken to the nurse's office where Security Agent Wilkins, observing that Reggie T. had been cut and had lacerations about his face, asked if he wished to press charges. Reggie T. stated that he had his "own police force."

Nicardo P. testified that on April 19, 1977, Michael P. arrived at his house with defendant. The three proceeded to Gardena High where they met Anthony L., spoke with some "Hoover Crips," and got "high." They discussed the problem of the Hoover Crips "jamming" Michael P. earlier. They proceeded to Washington High in Michael P.'s car, a 1963 Chevy, where they met James D., James McDaniels, Kenneth C., and Mark Edwards. James D. was in a brown automobile. Kenneth C. was in a Continental with Edwards and Anthony L. They drove to Milton D.'s home where they spoke of the Fives beating up Reggie T. who was also present. Everyone indicated they were going to talk to the Fives.

---

[1]The record shows that in April 1977, Nicardo P. and defendant were Raymond Crips with Michael P. being a member of the original Raymonds; that co-minor Reggie T. was or had been and Derrick J. was a Payback Crips of which Anthony L. was a leader; that Mark Edwards was an "ex-Payback Crip;" Milton D. had been a Payback Crip in 1975; and James McDaniels (who had fired the shots at the victim Bradley Phillips) and James D. were Hoover 9-Deuce or 107 Crips.

Following this discussion they drove to the area of Main and Allenhurst in the three cars. A number of the young males got out of the vehicles. Residents of the neighborhood scattered. Several people from the vehicles cornered Bradley Phillips next to a car where James McDaniels (also known as "Red") shot him repeatedly, killing him. After the murder, most of them left the scene in two of the cars. Michael P. was captured by local residents at the scene after unsuccessfully trying to start the third car, the white Chevrolet. Defendant and Nicardo P. walked away from the scene and went to Nicardo's house.

Immunity was given in this case to Nicardo P., Michael P., and Mark Edwards. Nicardo P. testified that they went to Main and Allenhurst to talk to the Fives and perhaps "box" (fistfight) if necessary. He also stated that on the day of the shooting he was "dusted" on PCP.

Michael P. testified that on April 19, 1977, he went to Anthony L.'s house and borrowed his "1964 Chevy." Milton D. and Reggie T. were also at Anthony L.'s house. Reggie T. stated that some "Fives boys" had "jammed"[2] him. Michael P. and Nicardo P. also heard this statement.

Anthony L., Nicardo P., and Michael P. went to Washington High to "get high and dusted," Reggie T. and Milton D. walked away. At Washington High Michael P. saw James D. and McDaniels together in a brown car. Defendant walked up to them and they discussed "smoking some dust." Anthony L. spoke of a "home boy" (Reggie T.) getting "jammed." Somehow it was decided to go to Reggie T.'s home to settle it so that Reggie T. could go "heads up" (one-on-one, with fists) with the person who "stole on him." McDaniels and James D. stated "we down" for this idea (meaning that "everybody is together").

According to Michael P., they proceeded to Milton D.'s house. On the way he saw Kenneth C. and told him they were going to Gardena so Reggie T. could have a fair fight with the guy who jammed him. He stated he wanted to go to ensure that no one else would jump in on the fight.

Eventually, they arrived at the corner of Allenhurst and Main where Michael C. testified he saw some boys standing on the corner. He saw McDaniels run around a car towards them. He heard three shots and he, along with Nicardo P. and defendant, ran back to the car. The

---

[2]"Jamming" means that someone "stole on him" when he wasn't looking and beat him up. He said the one who did it was a boy with a red permanent.

Continental and the Torino left, but his car stalled. They then ran up Allenhurst. Michael P. stated that some Fives caught up with him and jammed him. He lost one shoe while he was running. He further testified that he had never been involved in a "head-up" where someone violated the rules by using a weapon and that there had been no talk of any weapon before the shooting. He knew the victim, Bradley Phillips, and knew that he did not have a "red permanent."

Mark Edwards testified that Kenneth C., who was driving a black Continental, agreed to give him a ride on his way home from school. At Washington High he was told by Michael P. that Reggie T. had been in a fight with someone named Wade. When they arrived at Allenhurst and Main, Reggie T., Milton D., and one other were also in the Continental. He noted that people began running prior to any shots being fired. Edwards got out of the car. When Wade and Kelly began running, he and Reggie T. got back into the car. Edwards also testified that the reason he went to the Five's area was to get a ride and to see what was going to happen "fightwise." He did not see a gun or hear anyone speak of weapons.

Michael Gipson testified that on April 19, 1977, he was by the corner of Main and Allenhurst with Stanley Scott, Emitt McGee, and Bradley Phillips. He saw three cars (a black Continental, a white or beige "Toyota," and a 1963 Chevy) drive down Main, turn and stop in the middle of Allenhurst. Gipson saw Daryl Wade run around the corner, stating "he got a gun," and "he was going to bust" (shoot). He could see Kenneth C. driving the Continental with Reggie T. in the back. Wade ran into Scott's home through the front door, while Kelly, Scott, and McGee went in the back door. Gipson testified that he saw Bradley Phillips get off his bike and try to hide behind the Gipson's car. After he heard two shots, Gipson also ran into the house. He then heard three more shots. He described the person standing by the victim as a Negro, 5 feet, 8 inches tall, with short red hair, light brown coloring, weighing between 135 and 140 pounds, and wearing an orange shirt. He never saw anyone get out of the three cars, but there appeared to be four people in the Continental, four people in the Toyota, and three in the Chevy. After the shooting, Gipson testified he saw Michael P. in the Chevy trying to start it.

Gary Hamilton testified that he saw the three cars stop near the intersection. After the shooting, two people left the white Chevrolet and walked towards him. One of them was light-skinned with freckles. The

other one, who was short and dark-skinned and wore a hat, told him that there had been a shooting. The one with the freckles said nothing and just kept walking.

Daryl Wade, who has a reddish-brown permanent, testified that he was with Richard Kelly when he saw three cars come around the corner from Main on to Allenhurst. Someone in a Continental pointed towards him and hollered, "Get that Nigger right there." He saw the back door on the driver's side of the Continental open and observed someone exit with a gun in hand. It appeared to be a .38 caliber pistol. Wade yelled, "The Crips is coming," although he didn't actually recognize anyone in the cars as Crips. He saw the cars stop and recognized Michael P. in the Chevy with four others. He observed five people in the Continental. He told his friends to run because "them dudes is coming."

Wade saw a Negro with red or sandy brown hair wearing rust pants and a brown shirt standing over Bradley and pointing a gun at him. He heard Bradley screaming, "I ain't no Five." He then heard five shots, all at once.

Security Agent Wilkins testified that Anthony L. stated: "We did one of the Five boys in," and then said, "Well, I was just kidding. I got dusted and passed out and they used my car to go into the Fives neighborhood."

Emitt McGee, who was standing with Bradley Phillips on the corner of Main and Allenhurst before the shooting, testified that as he was running he heard Phillips say, "I'm not gang banging," and another voice say, "I don't care."

Mose R. McCormick testified that as he was pulling his school bus up to the corner, he saw several people, two of whom were on bikes. He saw one boy drop his bicycle on the curb, run around a car, and kneel down beside a parked car. He saw someone carrying a gun walk up to the car with three other people walking with him. The person with the gun then shot twice. The four boys jumped back and the shooter fired again. The other three boys began to run. The shooter started to leave, then stopped, turned, stuck the gun about 12 inches from the victim's head and fired again. The gunman then walked away. McCormick described the gunman as taller than the others with sandy red hair, a light complexion, and hazel eyes. McCormick recognized Reggie T. as being one of the boys with the gunman. He also identified Michael P. as being one of the three who was with the gunman.

Citing *People* v. *Hosner,* 15 Cal.3d 60 [123 Cal.Rptr. 381, 538 P.2d 1141], defendant contends that the court erred in denying his motion for a transcript of James McDaniels' fitness hearing. In *Hosner,* the court held that it was prejudicial per se to deny an indigent defendant a transcript of *his own* prior trial. The court, however, expressly reserved decision on the question of applying the per se rule of prejudice to other prior proceedings (such as a hearing on a motion to suppress, a hearing on the voluntariness of a confession, or a preliminary hearing which resulted in the defendant's discharge from custody). It stated: "Although at the time a motion for such a transcript is made the People may be unable to overcome a defendant's presumed need for the transcript, it may well appear upon appeal from the defendant's eventual conviction that nothing transpired at the prior proceeding which was material to the ultimate adjudication of guilt or innocence at trial." (*Hosner* at p. 71, fn. 7.)

■ In this case, defendant was denied a transcript, not of his prior trial, but of a fitness hearing involving a *codefendant* whose trial had been severed. The factual issues present in McDaniels' fitness hearing are remote from those present in the instant case. The issue at McDaniels' fitness hearing was whether McDaniels was a fit and proper subject to be dealt with under the Juvenile Court Law. (See Welf. & Inst. Code, § 707.) Only by recourse to speculation can it be concluded that McDaniels' testimony at this hearing dealt with the Phillips murder. The only mention in the record of the substance of his testimony consists of an unsubstantiated statement by defense counsel that it was her understanding that McDaniels indicated in his testimony that he was present at the scene of Allenhurst and Main. At defendant's trial, McDaniels invoked his right against self-incrimination. Thus, it appears that nothing transpired at McDaniels' fitness hearing that would be material to the ultimate adjudication of defendant's guilt or innocence in defendant's trial.

Defendant contends that the evidence was insufficient to support the sustaining of the petition. He also argues that the testimony of the alleged accomplices was not, but should have been, corroborated and that the statements of the alleged accomplices should have been excluded from evidence because no prima facie case of conspiracy had been shown.

■ Under Penal Code section 1111 accomplice testimony must be corroborated. However, it has repeatedly been held (most recently in *In re Mitchell P.,* 22 Cal.3d 946, 949 [151 Cal.Rptr. 330, 587 P.2d 1144]), that

this section does not apply to a juvenile court jurisdictional or adjudicatory hearing.

■ From the record it is clear that the evidence was sufficient to support the trial court's finding that defendant committed murder on a conspiracy theory. He argues that the evidence merely places him at the scene of some discussions and at the scene of the shooting. He also stresses the fact that he was a passenger and not a driver.

■ As the trial court noted, a member of a conspiracy to assault a person or persons is liable for all actions of his coconspirators taken in furtherance of the conspiracy. (See *People* v. *Smith,* 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222].) The California Supreme Court in *People* v. *Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17] stated: "As a general rule, a conspiracy can only be established by circumstantial evidence '. . . and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts . . . nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy . . . .' "

■ In this case, defendant was present at one or more discussions concerning Reggie T.'s fight with Daryl Wade and the plan to get even. Defendant traveled to a rival gang's (the "Fives") area in a caravan of three cars with nine or ten other youths. Before the shooting occurred, defendant, along with Michael P. and Nicardo P., had gotten out of the car. Michael P., a member of the same Crip faction as defendant, was identified by McCormick as one of the boys standing with McDaniels when the victim was killed. Michael P., Nicardo P., and defendant ran back to the car together. After the car failed to start, defendant and Nicardo P. ran from the scene on foot. ■ The evidence, although circumstantial, is clearly sufficient to support a conspiracy finding.

Defendant's argument that statements by Michael P., Nicardo P., and Edwards should not have been admitted because the prosecution failed to make out a prima facie case of conspiracy, is therefore without a basis in fact.

■ Defendant next argues that he was denied a fair trial because the trial court allowed McDaniels to invoke his privilege against self-incrimination. The record shows that he did not request any remedy from the trial court in connection with McDaniels' refusal to testify. Nor does he suggest on appeal what remedy the trial court should have afforded

him. He also fails to cite any authority for his unique and unusual proposition that his right to produce witnesses outweighs a witness' right against self-incrimination. Theoretically, McDaniels could have been granted immunity. However, defendant did not request that McDaniels be given immunity in the trial court. (See *People* v. *Sipress,* 51 Cal.App.3d 98, 102-103 [123 Cal.Rptr. 884].) Furthermore, immunity could not have been granted to McDaniels since the People did not request immunity. (See *People* v. *Manriquez,* 59 Cal.App.3d 426, 432-433 [130 Cal.Rptr. 585].) ■ The issue of immunity is a prosecutional prerogative as to which the defense has no right to attempt to have granted to witnesses. (*People* v. *Beyea,* 38 Cal.App.3d 176, 203 [113 Cal.Rptr. 254].)

Clearly, under these circumstances defendant was not denied a fair trial. There was no error.

Finally, defendant contends that the court erred in denying his motion to have witnesses Michael P., Nicardo P., and Mark Edwards examined by a psychiatrist. Defendant relies upon *Ballard* v. *Superior Court,* 64 Cal.2d 159, 176 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], in which the Supreme Court held that it was in the trial court's discretion whether or not to order a psychiatric examination of the complaining witness in a sex offense case. The court noted that such an examination would generally be necessary if "little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity." (*Id.,* at p. 177.)

In this case, the motion was argued at some length before the trial court. There was ample corroborating evidence to support the charge of murder aside from the testimony of Michael P., Nicardo P., and Edwards. The defense did not raise the issue of the effect of these witnesses' mental or emotional states upon their veracity, but rather attempted to show that each witness' alleged ingestion of PCP on the date of the murder affected his memory and perception. In any event, it should be noted that defendant was afforded testimony by John M. Stalberg, M.D., a psychiatrist, on the effects of PCP. ■ Aside from sex offense cases, the use of psychiatric testimony to impeach a witness is generally disapproved. (*People* v. *Johnson,* 38 Cal.App.3d 1, 7 [112 Cal.Rptr. 834].) As stated in *People* v. *Manson,* 61 Cal.App.3d 102, 137 [132 Cal.Rptr. 265], which, like the present case involved the charge of murder, "[t]he

nature of the charges in this case is such that psychiatric testimony for purposes of impeachment would be extraordinary."

Clearly, from the record, the ruling of the court was a proper exercise of discretion. There was no error.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied March 21, 1979, and appellant's petition for a hearing by the Supreme Court was denied April 19, 1979.