[No. B023407. Second Dist., Div. Four. Sept. 15, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARDO AGUAYO LEDESMA, Defendant and Appellant.

COUNSEL

Robert L. Sills, under appointment by the Court of Appeal, for Defendant and Appellant.

Linda F. Robertson as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—Appellant was convicted, following a jury trial, of second degree murder (Pen. Code,[1] §§ 187, 189), and the allegation he had used a knife in the commission of the offense was found to be true. (§ 12022, subd. (b).) He was sentenced to state prison for the term prescribed by law (15 years to life) plus an additional year for the use of the knife.[2]

Following a split decision of this court reversing appellant's conviction, the Supreme Court granted review and transferred the case to us "for reconsideration in light of *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307]."

Appellant challenges his conviction on the following grounds: (1) his constitutional rights were violated by the admission in evidence of a statement which he made to detectives who interrogated him at the police station while his attorney was attempting to obtain access to him; (2) inaccurate translation of the conversation between appellant and one of the interrogating detectives rendered the tape-recorded conversation inadmissible; (3) the trial court erred in not granting immunity to codefendant Moran, despite the absence of a request therefor by the prosecution; (4) the trial court erred in permitting a prosecution witness to testify concerning the reason for the absence of a missing witness; (5) the giving of certain jury instructions was erroneous; (6) appellant received inadequate representation from his trial counsel. For the reasons set forth below, we affirm appellant's conviction.

## FACTS

On Saturday night, October 5, 1985, appellant and codefendant Moran were drinking beer and playing pool at Rosa's Cantina when the victim,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Originally, the information also charged a codefendant, Ricardo Perez Moran, with the murder, but that charge was set aside as to Moran on his motion pursuant to section 995. Moran subsequently pleaded guilty to a second count in the information which charged him (but not appellant) with assault with a deadly weapon (§ 245, subd. (a)(1)) upon an additional victim. Moran is not a party to the present appeal.

Isais Juarez, entered with his brother. Juarez and his brother were served beer by Patricia Soto, whom appellant considered his girlfriend.

After Soto had conversed awhile with the victim, appellant called her over to his table. A few minutes later, Soto returned to the victim's table. Appellant followed her and asked the victim whether he wanted to stay with her. When he replied affirmatively, appellant ordered him a beer. Suddenly, Moran, who was larger than the victim, grabbed him by the neck, picked him up and shoved him against a wall, and asked him whether he was going to stay with Soto.

When the victim said, "yes," Moran struck him twice and shoved him out the door of the bar. Appellant followed, and a bar waitress told him to "leave the kid in peace." Appellant instructed her "not to get into it" and then proceeded to remove a knife from his clothing, open it, and walk out of the bar.

As two men beat the victim's brother about the head with pool cues, Moran and the victim traded blows. The victim pushed down appellant, who got up, approached the victim from the side, and stabbed him in the back. The victim turned toward appellant, who then stabbed him in the chest. The victim fell and was pronounced dead later that evening at a hospital after having been taken there by ambulance.

When appellant telephoned Moran at the bar later that evening, appellant was told that the police had come. Appellant replied, " 'Oh, that's okay. I guess we'll see what happens.' " Appellant knew he had stabbed the victim.

The following Monday, October 7, 1985, appellant went to work and at 9 a.m. made arrangements through his employer to meet with an attorney at 4:30 that afternoon and turn himself in. The attorney, Taylor Daigneault, was informed of the fatal stabbing and planned to surrender appellant to the police. Although appellant had not spoken directly with Daigneault concerning the case, they knew each other from work appellant had done on Daigneault's house. According to his testimony at trial, appellant planned to meet Daigneault at the latter's office so that Daigneault could escort appellant to the police station, where appellant would surrender.

After leaving work that day, appellant went home. Approximately half an hour later, at 4:30 p.m., he was arrested at that location. The precise time he was booked at the Harbor Division police station is not apparent from the record before us, but the interview of appellant by Detective Patrick Curran and Officer Robert Carrillo of the Los Angeles Police Department commenced at 6:10 p.m. and lasted "approximately 20 minutes or

so." No criminal charges had been filed against appellant at the time of the interview.

Officer Carrillo, who was fluent in Spanish, advised appellant in Spanish of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], including "the right to have a lawyer and, if he can't afford one, one provided for him." Appellant waived those rights and at no time indicated to the officers that he had an attorney, that he would like to speak to one, or that he had an appointment to see one that afternoon. At no time were the interrogating officers aware of the presence at the police station of Daigneault or any other attorney representing appellant, or of any attorney's desire to contact appellant. These officers did not see or hear anything that would indicate "anyone [was] trying to talk to [appellant]." No one from the front desk came back to speak with the two interrogating officers, and neither officer left the interview room until the interview was concluded. Appellant appeared to participate freely and voluntarily in the conversation with the officers, and no force or threats were used against him.

Testimony given by Attorney Daigneault indicates that sometime between 4:30 p.m. and 5:15 p.m., he received a telephone call from appellant's employer informing him of appellant's arrest. The employer had learned of the arrest from appellant's brother. "Immediately after" receiving the call, Daigneault telephoned the Harbor Division police station and inquired whether appellant was in custody. The person who answered checked and said appellant was not in custody. Daigneault then stated he was appellant's attorney and anticipated appellant's being booked, and "asked them not to talk with him until such time that I should arrive, that I was going to be leaving almost immediately." Daigneault believed he left his office no later than 5:30 p.m., arriving no later than 5:45 p.m., but it was possible he arrived as late as 6:15 p.m. Upon his arrival at the station, Daigneault again identified himself as appellant's attorney and asked that "whomever was concerned" be told not to ask appellant any questions until Daigneault had an opportunity to speak with him. Thirty or forty-five minutes after his arrival, Daigneault was informed by an officer that appellant was "in the booking process," and it was only after 8:20 that evening after booking was completed, that Daigneault was able to meet with appellant.[3]

Portions of appellant's statement to the police were offered in evidence by the prosecution, but only after appellant testified on direct examination in

[3] Most of the evidence concerning the circumstances under which appellant rendered his statement to the police officers was received outside the presence of the jury at a hearing held pursuant to Evidence Code section 402 at the request of defense counsel, during presentation of the defense but prior to appellant's testimony.

his own defense. In his testimony appellant admitted participating in the events leading up to the fight, as well as stabbing the victim, but claimed he was robbed by the victim and his friends upon leaving the bar after having displayed a large amount of cash. Appellant claimed to have stabbed the victim in self-defense upon being robbed.

Presumably in anticipation of being impeached by the statement which the trial court, over objection, had ruled admissible but which the jury had not yet heard, appellant on direct examination admitted telling the police that he had not stabbed the victim. Appellant explained that he made an "untrue" statement to the police because he "was scared." He also testified he had told the police that he had been mugged outside the bar. The prosecution cross-examined appellant concerning his statement to the police.[4]

DISCUSSION

I

WHETHER A VOLUNTARY STATEMENT OBTAINED AFTER A VALID WAIVER OF A SUSPECT'S MIRANDA RIGHTS IS ADMISSIBLE FOR ALL PURPOSES, EVEN WHERE AN ATTORNEY UNSUCCESSFULLY HAS ATTEMPTED TO OBTAIN ACCESS TO THE SUSPECT BEFORE OR DURING INTERROGATION BUT PRIOR TO THE FILING OF CRIMINAL CHARGES

Appellant contends that "failure to allow the appellant to speak with his counsel or to allow counsel to speak with appellant was a denial of due process."

After conducting an evidentiary hearing outside the presence of the jury at the request of the defense pursuant to Evidence Code section 402, the trial court concluded that appellant "did, in fact, intend to go in and meet with Mr. Daigneault and turn himself in"; that having been advised of his *Miranda* rights, appellant "could have said I have an attorney and I don't want to talk until an attorney was called. [¶] When he decided to go ahead and talk, . . . he was knowingly and voluntarily giving up his right to be represented by an attorney at that time, even though the attorney had come to the station. [¶] *Moran* vs. *Burbine* [(1986) 475 U.S. 412 (89 L.Ed.2d 410, 106 S.Ct. 1135)] specifically states that the police don't have any duty to tell the defendant at that time that the attorney's there. [¶] And . . . until the

---

[4]The defense also introduced the testimony of other witnesses who supported appellant's version of the events and offered character evidence on his behalf.

defendant either specifically asserts his rights to an attorney or the indictment has been filed, . . . the automatic right doesn't attach. [¶] So I'm going to deny the motion [to exclude appellant's statement]."

The foregoing ruling of the trial court was rendered on July 10, 1986, four months after the United States Supreme Court's decision in the *Burbine* case, upon which the trial court based its ruling. In *Burbine* the high court held that the admission in evidence of a suspect's voluntary confessions, obtained after a waiver of rights in accordance with the dictates of *Miranda* and prior to the filing of criminal charges, did not violate his privilege against self-incrimination or his rights to counsel and to due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The court, however, observed: "Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials *as a matter of state law*." (*Moran* v. *Burbine, supra,* 475 U.S. 412, 428 [89 L.Ed.2d 410, 425], italics added.)

It took our California high court less than seven months to accept the foregoing invitation to adopt its own "different requirements." On October 2, 1986, twelve weeks after the trial court's ruling at the Evidence Code section 402 hearing, and less than three weeks after the denial of appellant's motion for new trial (premised in part on the *Burbine* issue) and the ensuing sentencing, the California Supreme Court decided the case of *People* v. *Houston* (1986) 42 Cal.3d 595 [230 Cal.Rptr. 141, 724 P.2d 1166]. In *Houston,* over the dissent of then-Associate Justice Lucas, the court found itself "unpersuaded by the majority opinion in *Burbine*" (*id.,* at p. 610) and fashioned a rule of state law excluding statements given by suspects unaware that their attorney had come to the police station seeking to confer with them.[5]

For the reasons that follow, we conclude we are not bound by the rule set forth in *Houston,* but are compelled to follow the rule enunciated by the United States Supreme Court in *Burbine* and rejected by the California Supreme Court in *Houston.*

---

[5] The court concluded in *Houston*: "We therefore hold that, whether or not a suspect in custody has previously waived his rights to silence and counsel, the police may not deny him the opportunity, before questioning begins or resumes, to meet with his retained or appointed counsel who has taken diligent steps to come to his aid. [¶] If the lawyer comes to the station before interrogation begins or while it is still in progress, the suspect must promptly be told, and if he then wishes to see his counsel, he must be allowed to do so. Moreover, the police may not engage in conduct, intentional or grossly negligent, which is calculated to mislead, delay, or dissuade counsel in his efforts to reach his client. Such conduct constitutes a denial of a California suspect's *Miranda* rights to counsel, and his independent right to assistance of counsel, and it invalidates any subsequent statements." (*People* v. *Houston, supra,* 42 Cal.3d at p. 610, fns. omitted.)

The California high court in *Houston* declined to follow the United States Supreme Court's holding in *Burbine*, the California court relying on the principle "that our state Constitution is 'a document of independent force' (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099] . . . ); unless a contrary intent is apparent, its guarantees 'are not dependent on those [provided] by the United States Constitution.' (Cal. Const., art. I, § 24.)" (*People* v. *Houston, supra,* 42 Cal.3d at p. 609.)

*Houston* involved a police interrogation conducted in 1980, and the Supreme Court observed: "Application of the exclusionary rule in this case is not affected by Proposition 8 (see Cal. Const., art. I, § 28, subd. (d), as adopted by Initiative on June 8, 1982), since the conduct on which the criminal charge is based is alleged to have occurred well before the passage of the initiative. [Citation.]" (*Id.,* at p. 600, fn. 3.) The foregoing constitutional amendment provides in pertinent part that "relevant evidence shall not be excluded in any criminal proceeding."

Earlier this year the California Supreme Court held that the adoption of article I, section 28, subdivision (d), abrogated judicial exclusionary rules premised on the privilege against self-incrimination except where exclusion is compelled by the federal Constitution (*People* v. *May, supra,* 44 Cal.3d 309, 315-320), just as the court previously had held, with regard to exclusionary rules involving searches and seizures conducted by law enforcement officers, "that in the absence of express statutory authority therefor courts may not exclude evidence seized in violation of either the state or federal Constitution unless exclusion is compelled by the federal Constitution." (*In re Lance W.* (1985) 37 Cal.3d 873, 888 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *May, supra,* 44 Cal.3d at p. 316.)

■ Because the *Houston* rule is a judicially fashioned exclusionary rule not premised on statutory authority or federal constitutional compulsion, it has been repealed by article I, section 28, subdivision (d).

In *May,* the California Supreme Court held specifically that the 1982 constitutional amendment abrogated the California exclusionary rule barring the impeachment of a criminal defendant with extrajudicial statements obtained from him in violation of the *Miranda* decision (*People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]), and agreed with the Court of Appeal "that section 28(d) . . . thereby left *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] . . . to govern the case," thus authorizing such impeachment. (*People* v. *May, supra,* 44 Cal.3d at p. 314.)

■ Because appellant's interrogation by the police took place in 1985, after adoption of article I, section 28, subdivision (d), our task is to ascer-

tain whether the trial court was correct in admitting appellant's statement under authority of the United States Supreme Court's holding in *Burbine,* without regard to the intervening and now superseded rule of the *Houston* case.

In *Burbine,* "After being informed of his rights pursuant to *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and after executing a series of written waivers, respondent confessed to the murder of a young woman. At no point during the course of the interrogation, which occurred prior to arraignment, did he request an attorney. While he was in police custody, his sister attempted to retain a lawyer to represent him. The attorney telephoned the police station and received assurances that respondent would not be questioned further until the next day. In fact, the interrogation session that yielded the inculpatory statements began later that evening. The question presented is whether either the conduct of the police or respondent's ignorance of the attorney's efforts to reach him taints the validity of the waivers and therefore requires exclusion of the confessions." (*Moran* v. *Burbine, supra,* 475 U.S. at pp. 415-416 [89 L.Ed.2d at p. 417].)

Rejecting the argument that the police's "failure to inform [the defendant] of the telephone call, fatally undermined the validity of the otherwise proper waiver" (475 U.S. at p. 422 [89 L.Ed.2d at p. 421]), the United States Supreme Court found no violation of his Fifth Amendment rights: "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . [T]he same defendant, armed with the same information and confronted with precisely the same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. . . . No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. [Citations.] Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. [Fn. omitted.] . . . .

". . . [W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's

decision to waive his *Miranda* rights unless he were at least aware of the incident. Compare *Escobedo* v. *Illinois,* 378 U.S. 478, 481 (1964) (excluding confession where police incorrectly told the *suspect* that his lawyer ' "didn't want to see" him'). Nor was the failure to inform respondent of the telephone call the kind of 'trick[ery]' that can vitiate the validity of a waiver. *Miranda,* 384 U.S., at 476. Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid." (*Moran* v. *Burbine, supra,* 475 U.S. at pp. 422-424 [89 L.Ed.2d at pp. 421-422], italics in original.)

The court added, "Clearly, a rule that focuses on how the police treat an attorney—conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation—would ignore both *Miranda's* mission and its only source of legitimacy." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 425 [89 L.Ed.2d at p. 423].) The court posed the question (particularly appropriate under the circumstances of the case before us) whether under a contrary rule, "Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect?" (*Ibid.* [89 L.Ed.2d at p. 424].)

Concluding there was no violation of the Sixth Amendment, the United States Supreme Court held that "the Sixth Amendment right to counsel does not attach until after the initiation of formal charges," and rejected the "argument that the attorney-client relationship itself triggers the Sixth Amendment right." (475 U.S. at p. 431 [89 L.Ed.2d at p. 427]; see also *Patterson* v. *Illinois* (1988) 487 U.S. 285, __-__ [101 L.Ed.2d 261, 270-275, 108 S.Ct. 2389]; *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 184-187 [133 Cal.Rptr. 511, 555 P.2d 297].) The court in *Burbine* observed: "As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 430 [89 L.Ed.2d at p. 427].)

The defendant in *Burbine* also argued, as does appellant in the present case, "that the conduct of the police was so offensive as to deprive him of the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment." (475 U.S. at p. 432 [89 L.Ed.2d at p. 428].) The high court rejected this argument, concluding: "on these facts, the challenged conduct falls short of the kind of misbehavior that so shocks the

sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." (*Id.,* at pp. 433-434 [89 L.Ed.2d at p. 429].)[6]

As observed by the dissenting opinion in *Houston,* "[T]he 'communication' involved . . . was a one-way street, from an attorney seeking access to a suspect *who had already waived his right to talk with him.* ▄ The Fifth Amendment right against self-incrimination is the individual's right, not his attorney's." (*People* v. *Houston, supra,* 42 Cal.3d at p. 620, fn. 1 (dis. opn. of Lucas, J.), italics in original.) "The appearance of a lawyer at the stationhouse does not increase a suspect's need to invoke his rights." (*Id.,* at p. 621 (dis. opn. of Lucas, J.).) Nor should there be a "difference between a case where counsel has been retained but does not arrive at the police station while his client, who has validly waived his right to counsel, is being interrogated, and a case where the counsel does arrive, insisting on counsel's 'right' to speak to the suspect." (*Id.,* at p. 625 (dis. opn. of Lucas, J.).)

▄ In the present case as in *Burbine,* no criminal charges had been filed as of the date of the interrogation. In each case the suspect waived his rights after proper advisement; as conceded by appellant's counsel at the hearing conducted pursuant to Evidence Code section 402: "The defendant has not challenged that he [was] advised and understood and knowingly and intelligently, under the circumstances, waived whatever the rights were under *Miranda.*"

The present case affords an even stronger basis for upholding the trial court's admission of a statement obtained during police interrogation than was presented in *Burbine.* ▄ ▄ ▄ ▄ In *Burbine* the suspect waived his *Miranda* rights without knowing that others had arranged for an attorney to represent him.[7] (*Moran* v. *Burbine, supra,* 475 U.S. at p. 417 [89

---

[6] In *California* v. *Greenwood* (1988) 486 U.S. 35, 44-45 [100 L.Ed.2d 30, 39-40, 108 S.Ct. 1625] the high court rejected the argument "that the California constitutional amendment eliminating the exclusionary rule for evidence seized in violation of state but not federal law violates the Due Process Clause of the Fourteenth Amendment."

[7] In *Houston,* not only was the suspect unaware that others had arranged for an attorney to represent him, but the interrogating officer (as opposed to an officer at the booking desk), having spoken by telephone with the suspect's attorney prior to the commencement of interrogation, was well aware of the attorney's desire to consult with his client before questioning began and told the attorney he would relay the message to the suspect but failed to do so. (42 Cal.3d at p. 601.)

However, even the court in *Houston* acknowledged that under most circumstances a defendant's rights are not invoked merely by a telephone call (as opposed to a station house visit) from counsel: "In so holding, we do not contravene the result in *People* v. *Saidi-Tabatabai* (1970) 7 Cal.App.3d 981 [86 Cal.Rptr. 866]. There the court found no obligation to cease questioning when the suspect's counsel, who had reason to know the suspect was being interrogated, made only a telephone inquiry, did not ask that questioning be stopped, and never came to the station. There was no indication the authorities had misled the lawyer. Presiding Justice Kaus, writing for the majority, noted that the police had no means of verifying whether

L.Ed.2d at p. 418].) Significantly, in contrast, appellant testified that he had an appointment to see an attorney the afternoon of his arrest, and had planned to confer with him and then surrender himself at the police station in the company of the attorney; however, before arriving at the attorney's office he was arrested and taken to the police station. After being advised of his *Miranda* rights, appellant waived those rights and proceeded to give an exculpatory statement to the officers without telling them he had planned to speak with an attorney that day. Appellant never informed the officers (nor did he so testify) that he desired to consult with the attorney before speaking to the officers or have the attorney present during questioning. Appellant's only exercise of his right to remain silent consisted of his total silence at the police station concerning his plan to confer with an attorney that afternoon; in all other respects he exhibited no reluctance in fully communicating to the officers his exculpatory version of the events in question.

It was no doubt because of this desire to vindicate himself in the eyes of the officers that appellant felt it unnecessary to summon the attorney before giving the officers his exculpatory account of the incident. To allow appellant to choose this course of action and thereby obtain a reversal of his murder conviction would make a mockery of the constitutional protections which our higher courts have fashioned to ensure that police interrogation is conducted in a noncoercive manner.

Appellant and amicus curiae make the alternative argument that section 825 creates an exclusionary rule which, as a statutory enactment, survives the exclusionary-rule-repeal effected by the enactment of article I, section 28, subdivision (d). Section 825, in pertinent part, provides that "any attorney at law . . . may, at the request of the prisoner or any relative of such prisoner, visit the person so arrested." Violation of this provision by an "officer having charge of the prisoner" subjects the officer to both criminal and civil penalties.

■■■■■ Putting aside the question whether section 825's prerequisite of a request by "the prisoner or any relative" was met,[8] we have

---

the 'voice on the telephone' was actually the suspect's lawyer." (42 Cal.3d at pp. 610-611, fn. 16.)

[8]Appellant did not request that Attorney Daigneault come to the jail; instead appellant was advised of his right to an attorney and waived that right. In view of this circumstance, even if we were inclined to engage in the inference that Daigneault was at the jail at the request of appellant's brother, who communicated the fact of the arrest to appellant's employer, who in turn notified Daigneault, appellant's waiver of the right to see his attorney would appear to prevail over any interest on the part of the attorney in visiting appellant. This court has previously held, in the context of the civil remedies provided for violation of section 825,

been cited to no authority indicating that a violation of the attorney-visitation provisions of section 825 gives rise to an exclusionary rule barring the admission in evidence of statements obtained from the suspect during a period in which visitation was improperly denied.

It is well established that violation of the other provisions of that statute, requiring arraignment "without unnecessary delay, and, in any event, within two days after [the] arrest," does not require exclusion of statements obtained from the suspect during the period of delay. (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10-11 [291 P.2d 929]; *People* v. *Harris* (1981) 28 Cal.3d 935, 953 [171 Cal.Rptr. 679, 623 P.2d 240].) Appellant's attempt to characterize an alleged failure to comply with the provisions of section 825 as a federal due process violation under *Moran* v. *Burbine, supra,* "is no less than a suggestion that . . . the laws of each State are to determine the reach of [federal constitutional provisions]," a suggestion which the United States Supreme Court rejected and which we reject. (*California* v. *Greenwood, supra,* 486 U.S. at p. 44 [100 L.Ed.2d at pp. 38-39]. See also *People* v. *Kimble* (1988) 201 Cal.App.3d 726, 730-731 [248 Cal.Rptr. 41], *People* v. *Hall* (1988) 199 Cal.App.3d 914, 919-920 [245 Cal.Rptr. 458].)

In light of the circumstances of the present case, we conclude there was no violation of appellant's rights under the Fifth, Sixth, or Fourteenth Amendment.

## II

### WHETHER THE FAILURE OF DEFENSE COUNSEL TO LISTEN PRIOR TO TRIAL TO APPELLANT'S TAPE-RECORDED STATEMENT, WHEN COUNSEL HAD REVIEWED A SUMMARY THEREOF, AFFORDED APPELLANT INADEQUATE LEGAL REPRESENTATION

 Appellant contends he received inadequate legal representation at trial because of the failure of his counsel to listen prior to trial to the tape recording of appellant's conversation with the police.

The record reflects that counsel was in possession of a summary of the interview, had reviewed it, was familiar with its contents, persuaded the trial court to conduct hearings outside the presence of the jury concerning the admissibility of appellant's statement, and raised numerous objections thereto.

---

that it is "the prisoner" and not the attorney who is the "party aggrieved." (*Beltram* v. *Appellate Department* (1977) 66 Cal.App.3d 711, 718 [136 Cal.Rptr. 211].)

■ A criminal defendant is entitled to the assistance of counsel under both the federal and state Constitutions. "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) This right entitles the defendant "not to some bare assistance but rather to *effective* assistance[ ] [citations]," so that the defendant can reasonably expect "that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.]" (*Ibid.*, italics in original.) ■ "In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny. [Citations.]" (*Id.,* at p. 216.) To establish inadequacy, defendant "must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates . . . [and] that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

■ In addition to showing that counsel's performance was deficient, a criminal defendant must affirmatively establish prejudice "before he can obtain relief on an ineffective assistance claim." (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 217.) Defendant must show by a preponderance of the evidence "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Id.,* at pp. 217-218.)

■ ■ ■ ■ Applying the foregoing standards, we cannot perceive any way in which appellant was denied the right to representation by competent counsel or was prejudiced by counsel's not having heard the tape recording prior to trial.[9]

---

[9]The remaining points raised by appellant do not warrant extended discussion, and we dispose of them summarily.

Appellant's arguments relating to the translation of his interrogation by the police are without merit because the court (after denying appellant's motion for mistrial on this ground) ordered that a court-appointed interpreter retranslate for the jury the disputed portions of the tape recording, and the discrepancies in translation which ensued involved details which were either unrelated to the stabbing or inconsequential. No prejudice to appellant resulted from any initial error in translation. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Also without merit is appellant's argument that the trial court, without request by the prosecution, had an obligation to grant immunity to codefendant Moran (§ 1324) upon his having invoked his privilege against self-incrimination when called to the witness stand. (*People* v. *Estrada* (1986) 176 Cal.App.3d 410, 418 [221 Cal.Rptr. 922]; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 334-335 [153 Cal.Rptr. 261].)

Nor was there any impropriety in the trial court's permitting the prosecution to introduce testimony to establish the unavailability of a witness (*People* v. *Lyons* (1958) 50 Cal.2d 245,

## DISPOSITION

The judgment is affirmed.

McClosky, Acting P. J., and Goertzen, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 22, 1988. Broussard, J., was of the opinion that the petition should be granted.

---

266 [324 P.2d 556]), or any prejudice to appellant from any lack of prior notice that such a witness would be called. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

The jury instructions of which appellant complains were properly given. The 44-hour period between appellant's departure from the scene of the stabbing and his arrest at his home justified the flight instruction (CALJIC [Cal. Jury Instns., Crim. (4th ed. 1979)] No. 2.52) (*People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Caldera* (1959) 173 Cal.App.2d 98, 101 [342 P.2d 945]); the deletion of the cautionary instruction pertaining to oral admissions (CALJIC No. 2.71, last par.) was proper because appellant's statement was tape-recorded (*People* v. *Lynn* (1984) 159 Cal.App.3d 715, 737 [206 Cal.Rptr. 181]); instructions on excusable homicide clearly were unwarranted in view of the evidence (*Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006, 1012 [195 Cal.Rptr. 484, 47 A.L.R.4th 1]) and appellant's failure to request such instructions (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 354 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Mathews* (1979) 91 Cal.App.3d 1018, 1025-1026 [154 Cal.Rptr. 628]); and the giving of instructions on first degree murder was proper after the trial court's denial of a motion for judgment of acquittal under section 1118.1 as to that offense and in any event could not have prejudiced appellant in view of the jury's decision to convict him of second degree murder. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)