[No. E011231. Fourth Dist., Div. Two. Jan. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT EDWARD HAYDEN, Defendant and Appellant.

50

## Counsel

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, William M. Wood and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, Acting P. J.**—Defendant Scott Edward Hayden appeals his conviction of second degree murder (Pen. Code, § 187) with a finding that a principal was armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). He contends the trial court erred in refusing him a free transcript of the trial proceedings against severed codefendant Jack Riley, and that the court made instructional errors. The contentions are without merit. The judgment is affirmed.

FACTS

On June 11, 1991, at about 10 p.m., Carol Romine was working as a prostitute out of a motel in Ontario. Defendant drove up on his motorcycle and solicited a sexual act from Romine. Defendant and Romine went into a room at the motel. Defendant paid Romine $40 and they engaged in a sexual act. Romine went into the bathroom. When Romine came out, defendant—apparently dissatisfied with Romine's services—pulled a gun from his duffel bag, placed it to Romine's head, and demanded the return of his money. Romine returned the $40 and sat on the bed as defendant commanded.

Through the partially opened door of the motel room, Michael Rowe, Romine's boyfriend, saw defendant holding a gun on Romine. Rowe called to a friend, Clemmy Jones, and they went to Romine's room. As defendant exited the room, Rowe and Jones accosted defendant. Rowe pretended to hold a gun to defendant's back. Romine ran out of the room, saying that defendant had taken her money, and that defendant had a gun. Rowe in turn demanded the $40; defendant gave it to him. By this time, a number of people at the motel, including the eventual victim, David Woods, had gathered in the area because of the disturbance. Romine and her companions also took defendant's duffel bag. Defendant mounted his motorcycle and rode off, but he threatened twice, "I'll be back." Defendant's .45-caliber automatic pistol was in the duffel bag, along with a checkbook, some checks, and some items of clothing.

After defendant left, Romine and Rowe moved to another room at the motel. They kept the lights off in the room and watched from the window,

because they feared defendant would carry out his threat. Sure enough, later that night, Rowe saw a truck drive into the horseshoe-shaped driveway of the motel. Defendant was in the passenger seat, bent down, leaning, and bobbing from side to side. Codefendant Jack Riley was driving. From his own room, Clemmy Jones also saw the truck. Codefendant Riley was driving and defendant was in the passenger seat.

The victim, David Woods, another resident of the motel, had been standing out on the street when the truck arrived. As the truck circled the driveway and came toward the exit, someone inside the truck yelled, "Hey, nigger." Woods began to run away from the truck, but four to six gunshots were fired from the open driver's side window. Woods, shot through the back, died at the scene. The truck drove away.

Later that night, defendant called police and reported that his gun had been stolen. He fabricated a story to police that he had left the gun in his duffel bag on his motorcycle in front of his house, and when he came out 10 minutes later, the bag and the gun were gone.

Lewis Rivenbark was the business partner of codefendant Riley. Defendant was an employee of Riley's and Rivenbark's business. The morning after the killing, Riley went to the business premises and borrowed Rivenbark's truck. When Riley returned the truck later that day, Rivenbark found a handgun hidden behind the seat, wrapped in a towel. Rivenbark gave the gun to police; ballistics testing showed that bullets at the scene of the killing were fired by that gun.

Defendant called witnesses to testify to his character for nonviolence. One witness testified that defendant was nonviolent. She also said her opinion would not change even if she knew that defendant carried a gun and had taken money from a prostitute at gunpoint. Another witness testified that in his opinion defendant was nonviolent. The witness knew defendant carried a gun, but testified his opinion would change if he knew defendant had robbed a prostitute.

Jack Riley's girlfriend testified. She said Riley had come home drunk on the evening of the killing. Defendant came to their house later. Defendant's eyes were red, but he showed no other signs of intoxication. Defendant talked to Riley, and then both men left the house. Riley's girlfriend was asleep before Riley returned that night. Riley's girlfriend falsely told police, at Riley's behest, that Riley had been at home all night.

Defendant also presented opinion testimony of an employee of Riley's and Rivenbark's business that Riley was a racist. She testified that Riley had

made racist remarks in defendant's presence. The employee had also written a letter on Riley's behalf, however, stating that Riley was not racially prejudiced.

Rivenbark, Riley's business partner, testified that, on the day after the killing, Riley had told him things had "gotten out of hand" and that he (Riley) had shot "a nigger." When Riley was released from jail, however, Riley told Rivenbark that defendant had done the shooting. Riley also told police after his arrest that defendant did the shooting. Clemmy Jones said that defendant had leaned across from the passenger seat and fired the shots. Michael Rowe told police that defendant was the shooter, although at trial he testified he could not tell who the shooter was.

Originally, defendant and codefendant Riley were charged together. The information charged both defendant and Riley with murder of David Woods, together with allegations that defendant personally used a firearm (Pen. Code, § 12022.5) and that a principal was armed with a firearm. (Pen. Code, § 12022, subd. (a)(1).) Riley was charged in count 2 with being an accessory to the murder. (Pen. Code, § 32.) Defendant and Riley were both charged with shooting at an inhabited dwelling, arising out of a shooting incident earlier on the same evening. Riley was charged in that offense with personal use of a firearm.

Defendant's motion to dismiss the charge against him of shooting at an inhabited dwelling was granted. Defendant also successfully moved to sever his trial from Riley's. Riley was tried first. Defendant's trial began April 7, 1992. On April 28, 1992, the jury returned a verdict finding defendant guilty of the second degree murder of David Woods. The jury found not true the allegation that defendant personally used a firearm, but found true the allegation that a principal was armed with a firearm. Defendant was sentenced to 15 years to life on the murder count, and an additional one year for the armed enhancement.

DISCUSSION

1. *Court-paid Transcript of Former Codefendant's Trial.*

■ Defendant first contends the trial court committed automatically reversible error by denying his counsel a free transcript of the entire trial of severed codefendant Jack Riley. Defendant's trial counsel demanded the transcript on or about March 24, 1992. The trial court denied the request.

Defendant urges, with reliance on *People v. Hosner* (1975) 15 Cal.3d 60, 62 [123 Cal.Rptr. 381, 538 P.2d 1141]; *People v. Tarver* (1991) 228

Cal.App.3d 954, 956 [279 Cal.Rptr. 368]; and *Huffman* v. *Superior Court* (1990) 219 Cal.App.3d 1480, 1483 [269 Cal.Rptr. 12], and other authorities, that he was entitled, as an indigent defendant and in order to present an effective defense, to free transcripts of "prior proceedings." The contention is without merit.

*Hosner*, *Tarver*, and *Huffman* all involve the retrial of the *same* defendant on the *same* criminal charges. The California Supreme Court in *Hosner* held that, in such a case, the defendant is *presumed* to have a need for a full transcript of *his/her own* "prior proceedings." No such *presumption* of need has ever been held, however, as to transcripts of *someone else's* trial.

In some cases, it might be shown that there is a need for other, collateral transcripts. In *Woods* v. *Superior Court* (1990) 219 Cal.App.3d 708 [268 Cal.Rptr. 490], the defendant was criminally charged with cruelty to a child (Pen. Code, § 273a, subd. (2)). There had been a separate civil proceeding (order to show cause and temporary restraining order regarding domestic violence) involving the very same facts as underlay the criminal charge. Three witnesses testified at the civil proceedings. The Court of Appeal held that the due process right to the "basic tools of an adequate defense" meant that the transcript of the civil proceedings should have been provided. In *Woods*, however, the defendant had been an interested party in the prior civil proceedings, the testimony taken at the civil hearing was based entirely on the same facts at issue in the criminal case, and the defense attorney in the criminal case indicated that neither the defendant nor the public defender's office had funds to pay for a transcript. (219 Cal.App.3d at p. 711.)

It is significant here that Riley's trial involved a charge that was not present in defendant's case. Manifestly, not all the witnesses and issues would be the same between the two trials. Counsel never made any effort to distinguish between those portions of Riley's transcript that related to the murder charge, and those portions that would relate to other, clearly irrelevant, matters. On the one occasion when trial counsel did identify a particular witness's testimony and a basis for its relevance, the court granted the request for that transcript.[1] Defense counsel's indiscriminate insistence on the entire transcript of Riley's trial, when much of it was plainly irrelevant to defendant's ability to defend against the murder charge, was improper.

■ Defendant also claims that, "While the trial court stated defense counsel should use her own budget, this was not a satisfactory alternative."

---

[1]Defense counsel did request the transcript of a particular witness's testimony, based upon the fact that that witness had information adverse to defendant that was not contained in any reports. The trial court granted the request to transcribe that witness's testimony.

Defendant on appeal cites *Huffman* v. *Superior Court, supra*, 219 Cal.App.3d 1480, at page 1484, in support of this claim. The citation distorts the effect of *Huffman*; to be sure, the court did state, as defendant urges, that requiring a public defender to request funds from the board of supervisors was not a "rational funding alternative," but he omits the discussion in the case with respect to payment from the public defender's budget. The *Huffman* court discussed *People* v. *Contreras* (1981) 127 Cal.App.3d 248 [176 Cal.Rptr. 589], in which the trial court had denied a request for a transcript, directed the public defender to pay for the transcript from its own budget, but permitted renewal of the motion on a showing no alternative funding was available. The *Huffman* court also indicated that the trial court could properly explore alternative sources of public funding by directing the public defender to first seek funding from its own budget. The public defender there returned with a report that no such funding was available. In *Woods* v. *Superior Court, supra*, 219 Cal.App.3d 708, the public defender seeking transcripts of collateral matters involving the same defendant also represented to the court that the public defender did not have funding available to pay for the transcripts sought. Thus, even if defendant might be entitled to some transcripts, to be provided by *public funds*, there was nothing wrong with the court's request here that the public defender apply to its own budget as a source of public funds for the transcript. The deputy public defender here did not even undertake an inquiry, but simply insisted upon a free transcript of the *entire* proceedings at *court* expense.

Under the circumstances presented here, defendant has not shown that the trial court erroneously denied his request.

2. *Transferred Intent Instructions*.

■ Defendant contends the trial court committed reversible error by instructing on transferred intent.

Defendant first argues that, although Riley might have been mistaken about who the victim was, it is clear that the man he shot at was the man he intended to kill. He then contends that, where the person actually killed is the person intended to be killed, the doctrine of transferred intent does not apply. Defendant has again misconstrued the cases he cites. (*People* v. *Birreuta* (1984) 162 Cal.App.3d 454, 460-461 [208 Cal.Rptr. 635] [murder of both intended and unintended victims]; see also *People* v. *Calderon* (1991) 232 Cal.App.3d 930, 935-939 [283 Cal.Rptr. 833] [attempted murder of both intended and unintended victims]; *People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1472-1474 [250 Cal.Rptr. 836] [same].) These cases involve *two* murders or attempted murders, including *both* an "intended"

victim (in the true sense—i.e., the defendant knew who the victim was and intended to kill him or her) *and* an unintended victim. Because the fiction of "transferred" intent to kill is not necessary to hold the defendant liable for the actual murder of the intended victim, some cases have held that it is inapplicable when both the intended victim and an unintended victim are killed. That is not the case here. As defendant concedes, the transferred intent doctrine is applied to impose criminal liability—which otherwise could not be imposed—if a defendant attempts to kill one person but *by mistake* or inadvertence kills someone else. (*People* v. *Suesser* (1904) 142 Cal. 354, 365-366 [75 P. 1093].)

█ Defendant next appears to argue that (1) he saw both Rowe and Jones, and would have known who they were, and (2) although he might have intended to aid and abet Riley in shooting Rowe and/or Jones, (3) he would not have intended to aid and abet in shooting Woods (since defendant would have known Woods was not Rowe and/or Jones). Thus, defendant argues, if Riley mistakenly killed Woods instead of Rowe or Jones, defendant did not as an aider and abettor share the same intent with Riley, and could not be liable for Riley's murder of Woods.

Defendant's argument makes no sense. In the first place, defense counsel attempted to argue at trial that Woods *was* involved in taking defendant's money and gun from him (and therefore seeing Woods—who had helped "steal" defendant's money and gun—somehow provided "provocation" for the shooting). Under that part of the defense theory, both defendant and Riley would have had an equal intent to kill Woods as to kill Rowe or Jones. The transferred intent doctrine would not have entered into the jury's finding of guilt; the presence of the instruction was harmless. In the second place, assuming that defendant intended to kill Rowe and/or Jones, but not Woods, the jury was instructed that, in order to find defendant guilty as an aider and abettor of second degree murder, it was required to find that he and Riley shared that intent. The transferred intent instruction does not alter that requirement. Moreover, the evidence was plainly sufficient, as defendant concedes, for the jury to infer that defendant engaged Riley's support and both went to the motel gunning for Rowe and/or Jones. Whether defendant and Riley were both mistaken (as was entirely possible) that Woods was either Rowe or Jones, or whether only Riley made the mistake, both shared the same intent—to kill Rowe and/or Jones—and defendant was properly liable as an aider and abettor.

3. *Instruction on Concurrence of Act and Intent.*

█ Defendant next points out that the court failed to give an instruction with respect to murder that there must be a union or joint operation of act

and intent with regard to murder. The People respond that other instructions adequately apprised the jury that, with respect to the crime of murder, the unlawful killing had to be done *with* malice aforethought, or that "[t]he act was deliberately performed *with* knowledge of the danger to, and *with* conscious disregard for, human life." (Italics added.) Other instructions also focused on the defendant's intent at the time of the killing. Although the "concurrence of act and intent" instruction should have been given sua sponte, its omission was not prejudicial. There is no indication that defendant's acts as an aider and abettor were done other than with the concurrence of the requisite intent.

### 4. *Involuntary Manslaughter Instruction.*

■ The trial court refused defendant's requested instruction on involuntary manslaughter. Although the court did instruct on involuntary manslaughter on the theory of misdemeanor manslaughter (brandishing a firearm as the misdemeanor), it refused a requested instruction on the so-called "lawful act" theory of involuntary manslaughter. Usually, this theory is stated in terms of a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).) Defendant now argues the refusal of his requested instruction was prejudicial error, contending that the jury should have been given the opportunity to find defendant only intended to get his gun back and that he was merely criminally negligent in soliciting Riley to help him.

If the jury found that defendant was the actual shooter, then defendant's possible acts were either that he brandished the firearm, without necessarily intending to shoot, or that he intentionally fired the weapon. Brandishing supports a misdemeanor-manslaughter theory of involuntary manslaughter; that instruction was given. If defendant intentionally shot at Woods, he would have been guilty of something greater than involuntary manslaughter.

The same applies if Riley was the shooter. Either Riley brandished the gun and it accidentally went off, or he intended to shoot Woods. If Riley was the shooter, then defendant could be liable as an aider and abettor, but only if he had the intent or purpose of committing, encouraging or facilitating Riley's crime. If, as defendant appears to argue, he only intended lawfully to try to retrieve his gun, and he had no idea or intent that Riley would bring a gun, brandish a gun, or shoot a gun, then the jury under the instructions could not have found defendant guilty of anything. The jury did find defendant guilty, however, of second degree murder. In order to do so, the jury had to find that defendant acted with malice. There must be an absence of malice to reduce

a crime to manslaughter; the jury's verdict shows that the jury found malice. Accordingly, any failure to give additional instructions on involuntary manslaughter was harmless. ██ ██ (See *People* v. *Polley* (1983) 147 Cal.App.3d 1088, 1091 [195 Cal.Rptr. 496].)[2]

## DISPOSITION

Defendant's claims of error on appeal are without merit. The judgment is affirmed.

Timlin J., and McKinster J., concurred.

Appellant's petition for review by the Supreme Court was denied April 20, 1994.

---

[2]This court deems defendant to have contended (1) that the definition of reasonable doubt, as set forth in the CALJIC No. 2.90 jury instruction, is unconstitutional pursuant to *Cage* v. *Louisiana* (1990) 498 U.S. 39, 40-41 [112 L.Ed.2d 339, 342, 111 S.Ct. 328, 329-330], and see *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862], certiorari granted September 28, 1993, __ U.S. __ [125 L.Ed.2d 789, 114, S.Ct. 40]; and (2) that his conviction and true finding must be reversed because the trier of fact, in applying the law stated in that instruction, used an unconstitutional standard for determining guilt or innocence. (*Sullivan* v. *Louisiana* (1993) 508 U.S. __ [124 L.Ed.2d 182, 190-191, 113 S.Ct. 2078], citing *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 331, 111 S.Ct. 1246].)

This court further deems the People to have opposed this contention on the ground that under the principles of stare decisis (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), this court is bound by prior decisions of the California Supreme Court upholding the constitutionality of the definition of reasonable doubt as provided in CALJIC No. 2.90, which decisions rejected constitutional challenges based upon *Cage* v. *Louisiana, supra,* see *People* v. *Sandoval, supra.*

We agree that we are bound to follow the decisions of our state Supreme Court in *People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1235 [14 Cal.Rptr.2d 702, 842 P.2d 1], and *People* v. *Jennings* (1962) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009], and thus hold that the definition of reasonable doubt as stated in CALJIC No. 2.90 is constitutional. (*People* v. *Van Fossan* (1993) 19 Cal.App.4th 1680 [24 Cal.Rptr.2d 266].)