[No. D045682. Fourth Dist., Div. One. Apr. 3, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY J. MARKLEY, Defendant and Appellant.

COUNSEL

Elizabeth A. Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda L. Cartwright-Ladendorf and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—In August 2004, a jury convicted Mary J. Markley of felony stalking (Pen. Code,[1] § 646.9, subd. (a)) and found that she had previously been convicted of felony stalking within the meaning of section 646.9, subdivision (c)(2). In a bifurcated proceeding, the court found that Markley had served a prior prison term within the meaning of sections 667.5, subdivision (b) and 668. The court sentenced her to prison for six years, consisting of the middle term of two years for the stalking conviction, a consecutive three-year term for the prior stalking conviction, and a consecutive one-year term for the prison prior.

Markley appeals, contending that as an indigent defendant, she was entitled to a free transcript of her previous stalking trial, which took place in 2002, for purposes of preparing for the 2004 trial. Specifically, Markley maintains that her inability to obtain a transcript deprived her of her constitutional rights to a fair trial, to impeach prosecution witnesses and to intelligently decide whether to testify on her own behalf. She further contends that the court erroneously imposed both a two-year term for the stalking conviction (§ 646.9, subd. (a)) and a three-year term for the prior stalking conviction (§ 646.9, subd. (c)(2)). We agree with Markley's claim that the trial court erred in imposing both a two-year term pursuant to section 646.9, subdivision (a), and a three-year term pursuant to section 646.9, subdivision (c)(2). Accordingly, we remand the matter for resentencing.

---

[1] Statutory references are to the Penal Code.

FACTS

A

*Markley's History With the Victim*

Markley met Richard Habicht in the late 1990's when she was a customer at his furniture store. Markley visited the store on several occasions, and she and Habicht engaged in casual conversations, usually concerning real estate. On one occasion, Habicht asked Markley, who was a real estate broker, to prepare an offer on a property he and his business partner were interested in buying. The offer was not accepted.

Habicht eventually bought a house located near his store, without Markley's assistance. Markley asked Habicht to meet her at the house, which was vacant at the time, for lunch. Habicht agreed, believing Markley intended to talk with him about reselling the house or renting it for him. Instead, Markley told Habicht that she loved him, and that she wanted to have a child with him and live in his house. Habicht was flabbergasted and told Markley that would not happen. Prior to this occasion, there had never been any romantic overtures or expressions of affection between Markley and Habicht.

Within the next month, Habicht accepted two dinner invitations from Markley. The only physical intimacy between them during this period of time was a hug. During the second dinner, Markley insisted that she and Habicht had previously met while skiing at Mammoth Mountain, and that she knew his parents. Habicht knew these statements were not true and began to believe something was wrong with Markley. Habicht told Markley he did not want to see her anymore.

Markley continued coming to Habicht's store and asking for him. She also telephoned him at his home. Markley apparently believed Habicht was calling her, and became agitated when he denied it. Habicht was concerned about Markley's behavior and suggested that she seek help.

Linda Holden was Habicht's store manager. Markley came into the store one day and asked for Habicht. Holden told her that Habicht was not there and said that Markley should not be in the store. Referring to Habicht, Markley said, "I could just kill him." Holden believed Markley's threat was serious, and this caused Holden to be afraid. She immediately notified Habicht. On another occasion when Markley came to the store, she chal-

lenged Holden to call the police, saying, "Oh, Linda, you don't want to do that." Holden perceived this as a threat as well.

Markley telephoned Habicht to say she was accepting his proposal of marriage. Habicht had made no such proposal. After Markley made the comment that she could kill Habicht, he became concerned for his safety and for the safety of his employees, and decided to seek a restraining order. Markley was present in court at the hearing on the request for a restraining order. She told Habicht "the only reason we should be here is to get married." During the hearing, Markley admitted that the allegations in the application for a restraining order were true, and the court issued a restraining order.

In spite of the restraining order, Markley resumed calling Habicht at home. Habicht hung up the telephone when Markley identified herself. Markley also continued going to Habicht's store, and her demeanor became increasingly aggressive and angry. Both Holden and Habicht became more fearful of Markley. They perceived her presence as a threat.

One evening, Markley went to Habicht's house and knocked on the door, saying that she needed to talk to him. Habicht asked her to leave and told her he was calling the police. Markley told Habicht that she loved him. The police arrived 20 minutes later and arrested her. After that night, Habicht borrowed his father's gun and kept it next to his bed. Habicht viewed Markley's repeated and unwanted visits and contact as a threat. He was afraid Markley was going to kill him.

Following her arrest and subsequent incarceration, Markley was placed on probation under the supervision of Probation Officer Anna Guzman. Guzman discussed with Markley her probation conditions, including the condition that she stay away from Habicht and his store. Markley agreed to comply. During the period of Markley's probation, Guzman repeated to Markley the terms of the stay-away warning between 50 and 150 times, emphasizing that Habicht was afraid of Markley. Markley told Guzman that she was in love with Habicht and that he was sending messages to her that meant they were destined to be together. After assessing and evaluating Markley's case, Guzman believed Markley was at high risk to reoffend. Guzman instructed Habicht and Holden to call her if Markley were to contact them.

Within several months, Markley went to Habicht's store and was arrested. At a probation violation hearing, the court ordered Markley to stay away from Habicht. In spite of the order, Markley again returned to Habicht's store. Markley appeared angry and said she would try to forgive Holden for having

her arrested. Markley also asked Holden whether she had ever been strip searched. Holden interpreted those statements as threats. Markley was again arrested. At the probation violation hearing following this arrest, the court and Guzman again admonished Markley to cease all contact with Habicht.

Several months later, Holden received a telephone call from someone purporting to be from the district attorney's office. Holden later discovered that Markley had placed the call. Habicht received about six calls from Markley while Markley was incarcerated. Guzman had Markley's jail telephone privileges suspended because of her increasing defiance of the court's restraining order.

Markley pled guilty to another series of restraining order violations and was again sentenced to probation. As a condition of probation, Markley was to move home to Iowa. She was informed that if she were to return to California, she would face additional penalties and charges. Within two months, Markley again appeared at Habicht's store. When Holden told Markley to leave, Markley told Holden that Holden would not have a job as soon as Markley and Habicht were married, and said that she did not appreciate Holden getting in their way. Markley was even more angry, agitated, frustrated and desperate than she had been on prior occasions. Later that day, Markley telephoned Habicht and said, "How dare you set me up."

Markley was again arrested for violating probation. Guzman arranged for Markley to return to Iowa. Once Guzman confirmed that Markley was in Iowa, she informed Habicht, who was relieved.

Three months later, Habicht received seven or eight telephone calls from Markley. She told him that he should be in Iowa with her, or they should be married.

On December 31, 2001, Markley went to the home of Habicht's parents, who lived two houses away from Habicht. Markley told Habicht's father, Albert, that she loved Habicht and wanted to see him. Albert told Markley to go away and to stop bothering Habicht.

The following day, Markley returned to Habicht's parents' house and rang the doorbell. Habicht's mother, Madeline, asked who was there, and did not open the door. Markley identified herself and said she wanted to wish Habicht happy holidays. Madeline knew that Habicht was afraid of Markley, and told her to stay away. Markley left, but returned later that day in an airport van. She telephoned Habicht and told him that she was at his house. Habicht told

Markley he would be right there. When he got off the telephone with Markley, he called the police. Habicht then went to his house. When he arrived, Markley was sitting outside Habicht's house with her luggage next to her. Habicht told her that the police were coming to arrest her. In response, Markley said that the only car that should be coming was a limousine to take them to Las Vegas to get married. The police arrived and arrested Markley.

This incident resulted in the stalking charge for which Markley was convicted in a court trial in 2002. She served a prison term and was paroled on March 28, 2004. She did not appeal her conviction. As a condition of her parole, Markley was prohibited from contacting Habicht or his family and friends, and from passing near where Habicht lived or worked. A correctional counselor discussed Markley's parole terms with her, and she signed a form indicating that she understood them. Neither Habicht nor Holden was informed when Markley was released from prison.

## B

### *The Current Incident*

One day after Markley was released on parole, she went to Habicht's house. The doors were open and a contractor, Jim Southard, was installing hardwood floors. Southard noticed Markley standing in the living room, looking around. According to Southard, Markley appeared very professional and was holding a rolled up magazine. Markley told Southard she was a friend and neighbor of Habicht and asked Southard if he had seen Habicht. Southard told Markley that Habicht had been there earlier that day. Markley asked if she could look around and Southard said she could. Markley went upstairs to the master bedroom and Southard did not see her again.

That same day, Markley went to Habicht's store. She was very friendly to Holden and asked where Habicht was. When Holden told Markley that Habicht was not there, Markley walked to the back of the store. Holden called Habicht and then called the police. Habicht and a police officer arrived at the store 10 minutes later. Markley was sitting in a chair reading a magazine. Markley told the officer she was there to see Habicht and admitted that she was on parole. The officer placed her under arrest.

## C

### *Defense Evidence*

Forrest Whitaker, a former boyfriend of Markley's, testified that he had dated her for two years, and said that when he terminated the relationship,

she behaved in a mature manner. John Brown, a friend of Markley's, testified that he had known her since 1980. On December 31, 2001, Markley telephoned Brown to tell him that she was in town. They spent some time together, and had dinner. Markley told Brown she had flown from Iowa to Las Vegas and then to San Diego on a whim. Brown gave Markley some money to help pay for her trip home, and took her to the airport. In Brown's opinion, Markley was not violent.

## DISCUSSION

## I

### *Markley Was Not Entitled to Transcripts of Her Prior Trial*

Markley contends the trial court violated her constitutional rights to due process and equal protection by denying her request for a free transcript of her 2002 trial for use in the trial in this case. She asserts that the denial of her request resulted in structural error, requiring automatic reversal of her conviction. We disagree.

## A

### *Factual and Procedural Background*

On April 15, 2004, Markley brought a motion to be allowed to represent herself. The trial court granted the motion. Markley then requested discovery from the district attorney, including a copy of the witness list and "a transcript of previous trials since that will be brought up."[2] The prosecutor responded, "Your Honor, I'm not sure of that. I think there may be a formal procedure that needs to be gone through because that would probably be quite expensive." The court made no further comment and Markley did not seek clarification.

On July 21, 2004, Markley sent the prosecutor a discovery request and inquired whether the prosecutor had ordered "the trial transcript." The prosecutor responded that she had forwarded to Markley various discovery items, including the preliminary hearing transcript from the 2002 case, and the transcript of the court's decision and sentencing hearing in that case. The

---

[2] The court later granted the prosecution's motion to present evidence of Markley's prior acts between 1999 and 2002 as a course of conduct to prove Habicht's fear of Markley based on her implied threats. Markley did not object to the admission of the prior acts evidence.

prosecutor also stated that she had ordered Markley's testimony from the 2002 trial, as well as audiotapes or transcripts of the sentencing hearings and change of plea hearings from all of Markley's prior misdemeanor cases. On August 10, 2004, Markley sent the prosecutor a letter acknowledging that she had received some, but not all, of the discovery she had requested. Markley asked the prosecutor to forward a transcript of her testimony from the 2002 trial, and also requested that the prosecutor order a transcript of Habicht's testimony from that trial.

On August 16, 2004, one day before the trial in this case was scheduled to begin, Markley informed the court that she had not yet received a transcript of her own testimony from the 2002 trial despite the prosecutor's promise to send it. She also told the court, for the first time, that she would like to have a transcript of Habicht's testimony from the 2002 trial in order to prepare for the trial in this case. The prosecutor responded that the transcript of Markley's trial testimony had been sent to Markley on August 6, and said that if Markley had not received it, another copy could be forwarded to her. The prosecutor further stated that she had not ordered or obtained a transcript of Habicht's testimony from the 2002 trial. The court told Markley that if she wanted a transcript of Habicht's testimony, she should pursue her request with Private Conflicts Counsel (PCC).[3] The court said it would not order the transcript because the prosecution did not have it and thus, Markley was at no disadvantage.

Following her conviction in this case, Markley continued to request a transcript of Habicht's testimony from the 2002 trial, and inquired about the date on which the prosecutor had ordered a transcript of Markley's testimony from that trial.[4] Markley received the court reporter's estimate for the cost of both transcripts and submitted the estimate to PCC for approval. On October 5, 2004, PCC approved the request for the transcripts, and Markley received the transcripts the following day.[5]

---

[3] We take judicial notice of the fact that PCC is a division of the San Diego County Bar Association that provides ancillary services to indigent defendants who are acting in propria persona.

[4] Markley said she requested the transcripts after the trial had concluded, for use in preparing for sentencing.

[5] Markley moved for a new trial on the ground that the prosecution had withheld discovery—specifically the transcripts from her 2002 trial. In support of her motion, she attached a copy of Habicht's testimony from that trial.

## B

### The State's Obligation to Provide Transcripts of Prior Proceedings to an Indigent Defendant

█ Equal protection principles require that the government provide an indigent criminal defendant with a free reporter's transcript of prior proceedings if the transcript is needed for proper appellate review or for an effective defense. (*Griffin v. Illinois* (1956) 351 U.S. 12, 18–19 [100 L.Ed. 891, 76 S.Ct. 585]; *Britt v. North Carolina* (1971) 404 U.S. 226, 227–230 [30 L.Ed.2d 400, 92 S.Ct. 431] (*Britt*).) The policy behind this rule is to ensure that an indigent defendant receive "the basic tools of an adequate defense or appeal, when those tools are available for a price to other [defendants]." (*Britt, supra,* at p. 227.)

█ In *Britt, supra,* 404 U.S. 226, the United States Supreme Court articulated two factors relevant to determining the need for a transcript: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same function as a transcript." (*Id.* at p. 227.) As to the first factor, it can ordinarily be assumed that a transcript of a prior trial would be valuable to a defendant in a retrial. (*Id.* at p. 228.) Regarding the availability of alternative devices, the prosecution has the burden to show that the defendant does not need the transcripts or that the defendant has access to adequate alternatives that afford an effective defense. (*Id.* at p. 227.)

In *People v. Hosner* (1975) 15 Cal.3d 60, 65–66 [123 Cal.Rptr. 381, 538 P.2d 1141] (*Hosner*), the California Supreme Court extended the holding in *Griffin* to require that an indigent defendant be provided the transcript from a mistrial caused by a hung jury, upon request, where the defendant seeks the transcript to aid in his defense at a retrial. The *Hosner* court held that an indigent defendant is presumptively entitled to a free and complete transcript of a prior trial for use in a retrial on the same charges, upon proof of indigency and a timely motion. (See also *Shuford v. Superior Court* (1974) 11 Cal.3d 903, 907 [114 Cal.Rptr. 601, 523 P.2d 641] [defendant entitled to complete transcript of mistrial to prepare adequate defense in retrial].) Where the prosecution is unable to overcome the presumption of the defendant's particularized need for the transcript of his first trial, the erroneous denial of the defendant's motion for a free transcript requires automatic reversal. (*Hosner, supra,* at pp. 69, 71; see also *People v. Tarver* (1991) 228 Cal.App.3d 954, 957 [279 Cal.Rptr. 368]; *People v. Coats* (1984) 154 Cal.App.3d 1153, 1155 [201 Cal.Rptr. 762]; *People v. Vaughn* (1981) 124 Cal.App.3d 1041, 1045–1046 [177 Cal.Rptr. 773].)

*Britt, Hosner* and their progeny stand for the proposition that a defendant in a retrial is presumed to have a need for a full transcript of the prior proceedings that resulted in a mistrial. In the case of a mistrial and retrial, the transcript of the first trial would contain testimony pertaining to the same charges at issue in the retrial—in most cases, from the same witnesses who will be called to testify at the retrial. For this reason, the transcript of the first trial constitutes "a basic tool[] of an adequate defense." However, the *Hosner* court expressly reserved deciding whether the "per se rule of prejudice" would apply to a request for the transcript of some other "prior proceeding" such as a hearing on a motion to suppress, a hearing on the voluntariness of a confession, or a preliminary hearing that resulted in the defendant's discharge from custody. (*Hosner, supra,* 15 Cal.3d at p. 71, fn. 7.)

An indigent defendant who seeks a transcript from a prior trial for use in a later trial on separate and distinct charges stands in a position quite different from that of a defendant who seeks a transcript for use in preparing for a retrial on the same charges or for a direct appeal, since the issues in the later trial may be entirely different from those in the prior trial. Under these circumstances, the equal protection principles discussed in *Griffin, Britt* and *Hosner* are not necessarily implicated. Courts have held that a trial court may properly deny a request for free transcripts for use in a motion for new trial or for use in other requests for collateral relief unless the indigent defendant first demonstrates that the transcript is necessary for effective representation by counsel.[6] (See, e.g., *People v. Bizieff* (1991) 226 Cal.App.3d 1689, 1700 [277 Cal.Rptr. 678] [defendant not entitled, "as a matter of absolute right," to transcript of trial proceedings for use in connection with motion for new trial].) The court must decide each case on its own facts and circumstances in determining whether the defendant has made a sufficient showing of need. (*People v. Lopez* (1969) 1 Cal.App.3d 78, 83 [81 Cal.Rptr. 386]; *Bizieff, supra,* at pp. 1702–1703; see *People v. Hayden* (1994) 22 Cal.App.4th 48, 55 [27 Cal.Rptr.2d 127] [defendant not automatically entitled to transcript of entire trial of severed codefendant; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 333 [153 Cal.Rptr. 261] [indigent defendant not entitled to transcripts of codefendant's juvenile fitness hearing]; *United States v. MacCollom, supra,* 426 U.S. at p. 325 [defendant seeking collateral relief stood in a "different position" from one pursuing direct appeal]; cf. *Woods v. Superior Court* (1990) 219 Cal.App.3d 708, 713 [268 Cal.Rptr. 490] [indigent defendant entitled to transcripts of prior civil proceeding concerning same events as those alleged in criminal complaint].)

---

[6] Markley would have been entitled to a free transcript if she had pursued a direct appeal of her conviction following the 2002 trial. (See *United States v. MacCollom* (1976) 426 U.S. 317, 325–326 [48 L.Ed.2d 666, 96 S.Ct. 2086].)

■ We conclude that where a criminal defendant requests a transcript from a prior trial for use in a later trial on different charges, the necessity of the transcript for the preparation of an effective defense is not presumed. Rather, as in cases involving a motion for new trial or other collateral relief, the defendant must demonstrate specific need. We decline to extend *Hosner* beyond the circumstances recognized by the Supreme Court in that case.[7]

## C

### *Markley Did Not Demonstrate a Particularized Need for the Transcripts She Requested*

Having determined that Markley was not entitled to a transcript of her 2002 trial for use in connection with her 2004 trial as a matter of right, we consider whether she made a sufficient showing of particularized need for the transcripts she claims she did not receive.

### 1. *Request for Transcript of Markley's Testimony*

Markley asserts that she did not receive a transcript of her 2002 trial testimony, which she claims she needed in order to decide whether to testify at the 2004 trial.

■ Although Markley timely requested the transcript of her own trial testimony, the record shows the prosecutor provided Markley with all the discovery she requested, including the transcript of Markley's 2002 testimony, prior to trial. In denying Markley's motion for new trial, the court expressly found that the prosecutor's representations concerning the discovery provided to Markley were credible. We cannot substitute our judgment for that of the trial court on issues of credibility. (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Thus, the record does not support Markley's assertion that she did not receive a transcript of her 2002 trial testimony.

### 2. *Request for Transcript of Habicht's Testimony*

Markley contends the court was required to order a transcript of Habicht's testimony from the 2002 trial for her use in the 2004 trial. She asserts that

---

[7] Our analysis is not affected by the fact that the charges against Markley in both trials were similar (stalking under section 646.9, subdivision (a) charged in the 2002 trial and stalking with a prior stalking conviction under sections 646.9, subdivisions (a) and (c)(2) charged in the 2004 trial) or by the fact that the victim in both cases was the same. The events giving rise to the 2002 conviction were not the same as the events alleged in the 2004 criminal complaint. Any overlap between the two trials, including the testimony of Habicht, does not establish that Markley was entitled to the transcript as a matter of right. Rather, that fact might be relevant to Markley's showing of "particularized need" for the transcripts.

because her request for the transcript was denied, she was unable to impeach Habicht at the 2004 trial with his prior testimony.

Preliminarily, we note that Markley first requested a transcript of Habicht's testimony from the trial court on the day before the trial commenced. The request was thus untimely. (*Hosner, supra*, 15 Cal.3d at p. 66.) In any event, the court did not deny Markley the right to have a transcript of Habicht's testimony. Rather, the court advised her to ask PCC for help in obtaining the transcript, and noted that Markley would not be at any disadvantage without the transcript because the prosecution did not have it. Since Markley was not presumptively entitled to the transcript, the court properly directed her to obtain it through the appropriate channels. (See *People v. Contreras* (1981) 127 Cal.App.3d 248, 252–253 [176 Cal.Rptr. 589] [court properly directed indigent defendant to seek funds for transcript from public defender's budget or board of supervisors].)

█ The record shows that Markley in fact received the transcripts she requested, through PCC, albeit after the trial had ended. Markley's belated receipt of the transcripts was not due to any error by the court, but rather, to her own ignorance of the proper procedure by which to obtain the transcript, and the untimeliness of her request to PCC. By choosing to represent herself and thus forgo the assistance of counsel, Markley assumed the risk of "her own ignorance, and cannot rely upon the trial court to make up for counsel's absence." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1224 [131 Cal.Rptr.2d 499, 64 P.3d 788].)

█ Further, Markley did not demonstrate a particularized need for a transcript of Habicht's 2002 trial testimony. Although Markley explained to the court that she wanted the transcript to "prepare for this matter," she did not articulate with any specificity how the transcript would have been helpful to her. Further, Markley did not identify any potential inconsistencies in Habicht's testimony, nor did she demonstrate how the transcript of Habicht's prior testimony would have assisted her in impeaching him. Because Markley failed to make an adequate showing of need, the court did not abuse its discretion by declining to order the transcript.[8] (*People v. Bizieff, supra,* 226 Cal.App.3d at p. 1704.)

Even if the court erred in failing to order the transcript of Habicht's testimony, there was no prejudice to Markley. The current stalking charges were based on Markley's presence at Habicht's home and business on March

---

[8] Markley claims she repeatedly gave "very clear" reasons for needing the transcripts of the 2002 trial. However, Markley's statements regarding the need for the transcripts were made at the motion for new trial and at sentencing, not at the pretrial hearing. At no time before trial did Markley articulate to the court her particularized need for the transcripts.

29, 2004, one day after she was paroled. Habicht was not a percipient witness to these events. Instead, he provided testimony about the history of Markley's stalking behavior and about his ongoing fear of her. On this record, Markley cannot show that her inability to impeach Habicht with his prior testimony would have produced a significantly different impression of his credibility. (*People v. Brown* (2003) 31 Cal.4th 518, 545 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) Thus, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

## II

### *The Trial Court Erred in Imposing Sentences Under Both Sections 646.9, Subdivision (a) and 646.9, Subdivision (c)(2)*

The trial court sentenced Markley to prison for the middle term of two years for the stalking conviction under section 646.9, subdivision (a), a consecutive three-year middle term for the prior stalking conviction under section 646.9, subdivision (c)(2), and a consecutive one-year term for the prison prior. Markley contends, and the People concede, that the court erroneously imposed both a two-year sentence under section 646.9, subdivision (a) and a three-year sentence under section 646.9, subdivision (c)(2). We agree and remand for resentencing.

■ Under section 646.9, subdivision (a), stalking is punishable in the county jail or in the state prison for 16 months, two years, or three years. (See § 18 [felonies generally punishable in state prison for 16 months, two years, or three years unless otherwise specified].) Under section 646.9, subdivision (c)(2), "[e]very person who, after having been convicted of a felony under subdivision (a), commits a violation of this section shall be punished by imprisonment in the state prison for two, three or five years." (9) However, section 646.9, subdivision (c)(2) does not provide that the punishment is *in addition to* the punishment for stalking imposed pursuant to section 646.9, subdivision (a). Rather, section 646.9, subdivision (c)(2) provides an *alternative* sentencing scheme if the defendant has suffered a previous stalking conviction.

Markley was convicted of stalking after having previously been convicted of stalking. Thus, she was subject to punishment for two, three or five years under section 646.9, subdivision (c)(2). The court erred in sentencing Markley under *both* section 646.9, subdivision (c)(2) *and* section 646.9, subdivision (a).

## DISPOSITION

The judgment imposing sentences under both sections 646.9, subdivision (a) and 646.9, subdivision (c)(2) is reversed and the matter is remanded for resentencing under section 646.9, subdivision (c)(2) only. In all other respects, the judgment is affirmed.

McConnell, P. J., and Irion, J., concurred.